EDWARD L. BLINCOE v. THE CHOCTAW, OKLAHOMA AND
WESTERN RAILROAD COMPANY, *a corporation*.

(Filed September 8, 1905.)

1. **EMINENT DOMAIN—Damages.** In the exercise of the right of eminent domain under the statutes of Oklahoma, which provide for the appointment of commissioners to assess the injury sustained by individuals because of the exercise of such right, which statute contains a provision with reference to the duties of such commissioners, as follows: "And they shall inspect said real property and consider the injury which such owner may sustain by reason of such railroad; and they shall assess the damages which said owner will sustain by such appropriation of land," damages to be allowed are not limited to the real estate taken and injured, but may be such damages as the owner actually sustains to either his real or personal property by such appropriation of his land.

2. **SAME—Measure of Damages—Instruction.** An instruction of the court as follows: "The law does not permit you to fix speculative boom or fancy values upon the property in controversy but the law requires you to determine the reasonable market, salable value of the property if the owner was offering to sell on usual terms and a purchaser desired to pay." is not erroneous because of the use of the word "boom" as here used, the court having in this and other instructions been careful to advise and instruct the jury that the market value as contradistinguished from a purely imaginative or speculative value must be their basis for the assessment of damages.

3. **EVIDENCE—Error in Admission Thereof.** It is not error in the trial court where a question of damages under the law of eminent domain is being tried, to reject evidence of offers to purchase other property in the neighborhood of the land in question, about the time condemnation proceedings were instituted.

4. **INSTRUCTIONS—Evidence.** In the trial of such case an instruction to the jury as follows: "All these matters are proper for your consideration in determining the reasonable market value of the property, at the time it was taken, and the damages, if any, to the remaining lot, but you are not bound by this evidence alone. You have been permitted to make a view and inspection of the property in question. and you have a right to exercise your own judgment, based upon your inspection and observation, together with all the

evidence which has been permitted to go to you during the trial Remember all this evidence and your own observation is for the purpose of enabling you to form a correct judgment as to the reasonable market value, if any, of the remaining lot, caused by the excavation made by the railroad company on the lots that it took from Mr. Blincoe, and in your deliberation, you must consider all the evidence that you believe credible and give it such weight as in your judgment you deem it entitled to," is not error.

(Syllabus by the Court.)

*Error from the District Court of Logan County; before John H. Burford, Trial Judge.*

*Joseph Wisby, J. C. Strang* and *John Devereux* for plaintiff in error.

*Dale & Bierer,* for defendant in error.

### STATEMENT OF FACTS.

This is a proceeding instituted by the defendant in error in the district court of Logan county, to condemn lots three and four in block sixty three, East Guthrie, for a right of way and terminals for the defendant in error.

At the time said condemnation proceedings were instituted, plaintiff was the owner and in the actual possession of lots 3, 4 and 5 in said block 63, and at that time and for several years prior thereto had been making use of said lots as and for the purpose of a lumber yard, in which business of retailing lumber, he was then and had been for several years engaged.

Commissioners were duly appointed by the judge of the district court to appraise the damages to said lots 3 and 4 in said block 63 upon and across which the line of said railroad was projected, and on the 21st day of March, 1902, filed their report as to these two lots in the words and figures following, to wit;

"Value of land taken ..................... $5,500.00
"Value of improvements taken .............. 2,200.00
"Moving Lumber ......................... 250.00

"Total ............................. $7,950.00"

The commissioners in their said report also state "that the said The Choctaw, Oklahoma and Gulf Railroad Company has appropriated all of said described lots and tract of land, etc."

To this award both parties excepted and demanded a trial by jury, and the cause was duly certified to the district court of said Logan county for trial. At the March term, 1903, the cause came on for trial before a jury, and after the same had been concluded, and after the jury had deliberated upon their verdict, they returned into court and announced that they were unable to agree, and were therefore discharged. On the 21st of December, 1903, the cause again came regularly on for trial in said court before a jury, and during the course of this trial the following facts were developed, viz:

Lot 5 in the same block lies immediately contiguous to lots 3 and 4 and was owned and being made use of by Blincoe in connection with his lumber yard, and as a part thereof. Also at the time of condemnation Blincoe had a large stock of lumber in the yard, and that the defendant in error immediately took possession of said lots 3 and 4 and the buildings and improvements thereon, removed the buildings and improvements, and excavated the ground to a considerable depth covering the whole of lots 3 and 4 and up to the line of lot 5, thereby making a retaining or supporting wall necessary to preserve the integrity of that lot. The action of the railroad company also made it necessary for Blincoe

to remove the stock of lumber and other building material then on hand, from said lots 3 and 4. The evidence disclosed that from January, 1902, up to and after the time these premises were condemned, there was a very marked increase or appreciation in the value of all real estate in the vicinity of the premises condemned.

At the conclusion of the evidence the jury were permitted under the charge of a bailiff to view the premises and after their return into court were instructed by the court.

The jury returned their verdict in the cause in the following form:

"We, the jury in the above entitled cause, do upon our oaths, find the issues in favor of the defendant, and assess the amount of his recovery at the sum of seven thousand and five hundred dollars."

Ten special questions were also submitted to the jury among them the following:

"Q. 1. What was the fair market value of the two lots of the defendant taken by the railroad company for right of way at the time of the condemnation?
"Ans. Six thousand five hundred dollars.

"Q. 3. What was the value of lot 5 in block 63 at the time lots 3 and 4 were condemned by the plaintiff railway company?
"Ans. Twenty-five hundred.

"Q. 9. What was the value of lot five immediately after the railroad company completed its excavation on lots 3 and 4?
"Ans. Fifteen hundred dollars."

Opinion of the court by

GILLETTE, J.: Four assignments of error are set out in the petition in error herein, viz: First, that the court erred in receiving incompetent evidence over the objection of

the plaintiff in error; second, that the court erred in overruling a motion for a new trial; third, because the said judgment of the said district court is contrary to law and not sustained by the evidence; fourth, for error committed by the court in its charge to the jury, which was duly excepted to at the time by the plaintiff in error.

These alleged errors will be discussed in the order in which plaintiff in error has presented them in his brief.

The first and principal proposition involved in this case arises on the rejection of evidence offered on the part of plaintiff in error tending to prove the necessary expense of moving his lumber yard from the lots 3 and 4, and in giving instructions No. 10.

During the examination of plaintiff in error he was asked the following question:

"I want to ask you, Mr. Blincoe, about the removal of your lumber, what did it cost you, or what was it worth to remove your lumber from those lots?"

Which question was objected to and the objection sustained.

The tenth instruction to the jury is as follows:

"10th. You are instructed that you cannot allow the defendant lot owner anything for injury to his business, or for removing his business from the property in controversy, or for any depreciation, if that existed, in the value of his stock of material by reason of having to move the same from the premises and to conduct his business elsewhere. The law does not allow a railroad company to acquire a mercantile business, or to take personal property by condemnation. All that the railway company has a right to take is the land with the improvements thereon, that is, the land with the buildings and improvements that were affixed to the lots. A railroad

company has no authority to take anything else, and consequently cannot be charged for anything else than the real estate taken, and any damages to the remaining portion not taken belonging to the same owner."

It is to be observed that at the time of the condemnation the plaintiff in error had a large stock of lumber in the yard embracing lots 3 and 4 and 5, which he was forced to move, and as a part of his damages plaintiff in error offered to show what was the reasonable expense of making such removal of his lumber from the location taken by the railroad company, to another. This offer was refused, and this, together with the tenth instruction above set out, constituted the ground of error now being considered.

In the ruling upon the admission of testimony objected to, and in giving instruction No. 10, Chief Justice Burford, before whom the case was tried in the court below, manifestly followed the plain and unequivocal declaration of Lewis on Eminent Domain, vol. 2, second ed. sec. 488, an authority quoted by nearly all the text writers and liberally cited by the courts in determining questions pertaining to eminent domain. That authority says:

"But damages to personal property, or the expense of removing it from the premises, cannot be considered in estimating the compensation to be paid." Citing *Central Pacific R. R. Co. v. Pearson,* 35 Cal., 247, and many other authorities, a number of which we have carefully examined.

Upon investigation of this subject we are of the opinion that the above paragraph from Lewis on Eminent Domain, general in its terms and apparently laying down a universal rule, cannot be sustained as the law of this case, and the rul-

ing of the court and instruction given pursuant thereto must be held to be erroneous under the law of this Territory.

In the absence of constitutional provision, or statutory authority, or in a case where a constitutional provision or statute limits liability in the exercise of the right of eminent domain, to the property actually taken, the limit of liability would be fixed by the value of what is taken, and consequential damages could not be considered.

This is substantially the declaration of the supreme court of California in *Central Pac. R. R. Co. v. Pearson, supra.*

The statute of that state then under consideration governing the action of commissioners appointed to condemn a right of way for a railway says:

"They shall ascertain and assess the compensation *for the land* sought to be appropriated, to be paid by said company to the person or persons," etc.

Commenting upon this provision of the statute the court says:

"The item of seven hundred dollars allowed Pearson for the supposed cost of removing his personal property from the premises was *improperly* allowed by the commissioners, and should have been stricken out by the court below. In cases of this character the landowner is entitled only to such damages, over and above the value of the land sought to be appropriated, as the statute gives. Whether the statute gives only the cost of fencing, over and above the value of the land taken, as claimed by the appellant, it is unnecessary to decide for the purposes of this case. Upon that question the statute is by no means clear, but we are satisfied that it does not, in any event, allow compensation over and above the value of the land actually taken, the cost of fencing and cattle guards, and such damages as may accrue to that portion, if any, of the

land of the landowner which is not taken, by reason of its severance from the part taken, and the construction of the railroad in the manner proposed. The cost of removal from the premises is not including."

And in *Feldon v. City of Jacksonville*, 28 Fla., 558 (10. So. 457) it was held that a constitutional guaranty that private property shall not be "taken" or "appropriated" without compensation, did not embrace mere consequential damages resulting to property abutting on a street from a change of grade of the street or other improvements thereof, but only to a trespass upon or physical invasion of the property. The reverse of this, however, is held by courts determining like questions under different constitutional and statutory provisions.

Under the first constitution of Illinois, 1848, which provided that no man's property shall "be taken or applied to public use without just compensation being made to him," the supreme court of the United States in *Transportation Co. v. Chicago*, 99 U. S., 635 and 644, held that "persons appointed or authorized by law to make or improve a high way are not answerable for consequential damages, if they act within their jurisdiction."

In 1870 the constitution of Illinois was changed so as to read: "Private property shall not be taken or damaged for public use without just compensation," and under this provision the supreme court of Illinois in *Regney v. City of Chicago*, 102 Illinois, 64, said that the framers of that instrument (Constitution of 1870) evidently had in view the giving of greater security to private rights by giving relief in cases of hardship not covered by the preceding constitution, and that the new rule required compensation in all cases where

it appeared "there has been some physical disturbance of a right either public or private, which the plaintiff enjoys in connection with his property, and which gives to it an additional value, and that by reason of such disturbance he has sustained a special damage with respect to his property in excess of that sustained by the public generally."

This determination of the supreme court of Illinois was commented upon by the supreme court of the United States in *Chicago v. Taylor,* 125 U. S. 161, and was by that court approved.

The supreme court of the state of Washington, 31 Pac. 313, citing the change in the Illinois constitution says the action of that state "has since been followed by West Virginia, Alabama, Missouri, Nebraska, Arkansas, Texas, Georgia, California, Colorado, Kentucky, Montana and the Dakotas," and cites numerous decisions sustaining the construction given by the supreme court of Illinois to the language of its constitution of 1870, and then says:

"Every court in which the point has been raised has decided in favor of the private citizen, but were it now presented to us for the first in the history of the phrase, we should not be disposed to view it in any way different from that expressed in the cases we have cited. If private property is damaged for the public benefit the public should make good the loss to the individual. Such always was the equity of the case and the constitution makes hitherto disregarded equity now the law of it."

The supreme court of Colorado in *City of Pueblo v. Straight,* 36 Pac. 789, quotes with approval the foregoing language of the Washington court.

From these cases it will appear that there is no general rule governing the manner in which damages to private prop-

erty when taken for public use, are to be measured. Such measurements must depend upon the constitutional or statutory law authorizing the taking, and consequential damages will be allowed when justified by such provisions.

Is the taking and damage to personal property under the law of eminent domain within the foregoing rule applicable to real estate? If so the exercise of this power over or upon the property of a citizen should carry with it the right of the citizen to recover all the damages he has suffered by reason of its exercise, whether to his real or personal property.

The taking of private property for public use is said to be the exercise of the right of eminent domain, and with reference to it Redfield on the Law of Railways, vol. 1, p. 229, under the title of "Eminent Domain," says:

"It is a distinct right from that of public domain, which is the land belonging to the sovereign. This is a superior right which the sovereign possesses in all property of the citizen or subject, whether real or personal, and whether the title were originally derived from the sovereign or not."

The tenth instruction of the court is not in harmony with the foregoing definition of eminent domain as set out in th eabove quotation from Redfield on the Law of Railways.

This instruction, in harmony with the ruling of the court upon the introduction of testimony, instructs and advises the jury as the law in this case, where real estate is condemned and personal property injured and damaged because thereof, such injury and damage cannot be recovered in this action, and this we have attempted to show cannot be upheld unless it is in accord with the statute of the Territory and the constitution of the United States. We do not think it is.

The statute under which these condemnation proceedings were had, reads as follows:

"The commissioners shall be duly sworn to perform their duties impartially and justly; and they shall inspect said real property and *consider the injury which such owner may sustain by reason of such railroad;* and they shall assess the *damages which said owner will sustain by such appropriation of his land.*"

The language of our statute above quoted would seem to leave it immaterial whether or not a railroad company can "take personal property" by condemnation proceedings.

If damage to personal property is incident and necessarily caused by the exercise of the power of eminent domain in taking land, then the "owner" is injured "by reason of such railroad."

That the owner "by reason of such railroad" has been put to the expense of removing the stock of lumber then on hand, is not disputed; neither can it be denied that the cost of such removal was made necessary by the condemnation of the real estate, and is an injury and damage to the owner to the extent of the cost of such removal. In other words, this ruling would permit the railroad to take the owner's land and thereby compel him to bear whatever expense may be consequent upon preserving his personal property, and yet be remediless therefor.

If this shall be held to be the law then the constitutional provision—"nor shall private property be taken for public use without just compensation"—becomes almost as much a sword as a shield to the private citizen, for the compulsory addition to the cost of the personal property of the citizen is as much a taking as the absorption of the real estate itself. Nor is this conclusion relieved or its result modified

to the citizen by the fact that the agency thus arbitrarily adding to the cost of his property, cannot carry on the business in which he is engaged. The result to the citizen in this case is the same whether the railroad company is benefited by the expenditure or not. In either even the cost of removing the lumber is dead loss to him, occasioned by this taking of his real estate under this power of eminent domain.

In *Grand Rapids R. R. Co. v. Cheeseboro,* 42 N. W. 69, the court by Mr. Justice Campbell say:

"The damages in such a case must be such as to fully make good all that results, directly or indirectly, to the injury of the owner in the whole premises and interests affected, and not merely the strip taken," citing a large number of case, among them *C. R. I. & P. R. R. Co. v. Heisel,* 11 N. W. 215, where the court again says:

"It need hardly be said that nothing can be fairly termed compensation which does not put the party injured in as good a condition as he would have been in if the injury had not occurred. Nothing short of this is adequate compensation * * And in *Judd v. Hull Dock Co.* 922 B. 443, it was held that where the property taken was a brewery in operation the damages included the necessary loss in finding another place of business." And they say: "The following are cases where the damage done was in this case distinct from the actual taking of property from the party injured," citing a number of English cases.

In the *Chicago, etc. R. R. Co. v. Hock,* 118 Ill. 587, 9 N. E. 205, the court say:

"The inconvenience and cost of removal of the business from the premises condemned are mentioned as elements of damage proper for consideration. This however is in harmony with the ruling in *St. Louis V. & T. H. R. Co. v. Capps,* 67 Ill. 607.

In the case of the *A. T. & S. F. R. Co. v. Schreider* 20 N. E. 41, the following instruction to the jury was upheld, viz:

"The jury are further instructed that in determining the amount of compensation to be awarded to the defendants in this case, they may properly take into consideration all evidence tending to show the actual value of the leasehold interest to the respective defendants of which it is proposed to deprive them; the actual loss to be suffered by these defendants, from the loss, destruction or deprivation of the improvements placed by them in the properties specially adapted to the conduct of their business, if any, shown by their evidence; *the reasonable cost of removal,* and of refitting in other localities for the further conduct of business, as shown by the evidence."

In *Hannibal Bridge Co. v. Schaubacher,* 57 Mo. 582, it was held:

"Under a statute requiring the commissioners in condemnation proceedings to assess the damages which the owner of the land may sustain by reason of such appropriation, consequential damages resulting from the appropriation may be allowed. The asssessment is not confined by the land actually taken."

This statute differs from the Oklahoma act chiefly in the use of the word "damages," where our statute contains the word "injury." Both statutes were doubtless intended to cover the same ground and protect the same interests, and to the same extent, and neither one has any reference to speculative, imaginative or hypothetical damages, but both were intended to and do refer to and include all the actual damages capable of exact or approximate measurement which the owner may sustain by reason of such railroad.

The expense of moving the stock of lumber in the yard at the time of the condemnation and appropriation, is a direct loss to the owner, and an added burden not shared by other members of the public.

In *Monongahela Navigation Co. v. United States,* 148 U. S. 312, Mr. Justice Brewer, speaking for the court of the concluding clause of the fifth amendment of the constitution of the United States, which says:

"Nor shall private property be taken for public use without just compensation," holds as follows:

"It in no wise detracts from the power of the public to take whatever may be necessary for its uses; while, on the other hand, it prevents the public from loading upon one individual more than his just share of the burdens of government;" and he further says:

"When he surrenders to the public something more and different from that which is exacted from other members of the public, a full and just equivalent shall be returned to him. * * * The noun 'compensation,' standing by itself, carries the idea of an equivalent. Thus we speak of damages by way of compensation, or compensatory damages, as distinguished from punitive or exemplary damages, the former being the *equivalent* for the *injury* done, and the latter imposed by way of punishment. So that if the adjective 'just' had been omitted and the provision was simply that property should not be taken without compensation, the natural import of the language would be that the compensation should be the equivalent of the property. And this is made emphatic by the adjective 'just.' There can, in view of the combination of these two words, be no doubt that the compensation must be a full and perfect equivalent for the property taken."

In that case a private corporation had obtained a charter and franchise from the state of Pennsylvania for the erection

of a dam and lock in the Monongahela river for the passage of boats on that stream, with the right to take tolls for the passage of the same.

The United States under this power of eminent domain condemned and took from the corporation the dam and lock by it constructed, and the trial court held the corporation was entitled to compensation for the dam and lock, but nothing for the franchise or right to take tolls. In that case, as in this, it was urged that the government was liable for what it obtained, viz, the dam and lock, but for nothing more. To this argument Justice Brewer replied as follows:

"It is also suggested that the government does not take this franchise; that it does not need any authority from the state for the exaction of tolls, if it desires to exact them; that it only appropriates the tangible property, etc. * * * But this franchise goes with the property; and the navigation company, which owned it, is deprived of it. The government takes it away from the company, whatever use it may make of it; and the question of just compensation is not determined by the value to the government which takes, but the value to the individual from whom the property is taken; and when by the taking of the tangible property the owner is actually deprived of the franchise to collect tolls, just compensation requires payment, not merely of the value of the tangible property itself, but also of that of the franchise of which he is deprived."

It may be suggested that in that case the franchise was an inseparable part of the property taken, and therefore was inevitably swept away by the taking of the tangible property. Likely that is so, but it was no more an inevitable loss to the owner than is the necessary cost of moving the lumber in the case at bar; nor can it be said to be any more capable of ascertainment. A franchise may be valuable in one place and

of no value in another. It may be of value today and because of climatic conditions of little or no value tomorrow. In any event it is at best a matter of computation to be made from the testimony in the case, and not susceptible of that degree of certainty which can be reasonably expected in reference to the expense of moving a given quantity of lumber. The fact that it inheres to or grows out of some right in other property, real or personal, can make little difference to the owner, who is called upon to alone bear the burden of its loss. To him the loss is the same whether it is the questionable value of a franchise, or the direct compulsory taking of the money necessarily expended in removing a stock of lumber. And, as said by Justice Brewer above, the loss to him is measured not by the use the taker may make of it, but by the burden thus cast upon him.

It is next objected that the court erred in its sixth instruction to the jury, which reads as follows:

"Several witnesses have been permitted to give their opinions as to the value of the property in question, and the amount of depreciation in value of lot five. These opinions have been varied and conflicting, and are not controlling on your judgment. They must be considered and given just such weight as the conditions entitle them to. The value of this class of testimony depends upon the intelligence, fairness and impartiality of the witness. his knowledge and experience in determining values, and whether he is prejudiced, biased or influenced by like interests. The law does not permit you to fix speculative, boom or fancy values upon the property in controversy, but the law requires you to determine the reasonable market saleable value of the property, if the owner was offering to sell on usual terms and the purchaser desired to buy."

The particular objection to this instruction is the use of the word "boom" as used.

On a careful reading of this instruction it will be seen that the court made use of the three words speculative, fancy and boom, as nearly equivalents to each other, and did not intend by the use of the word "boom" to extend the ordinary meaning of the other words made use of.

Undoubtedly a railroad company when it invokes the aid of the power of eminent domain to condemn the property of a private citizen for its use must be required to make full and just compensation to him, and it has done so when it has paid the fair market value of the property on the day it was taken, without reference to how or when that market value came into existence. But it must be its market value as contradistinguished from a purely imaginative or speculative value which does not in fact exist; and this we think is what the court intended to and did in fact instruct the jury in the language complained of. The court said: "The law does not permit you to fix speculative, boom or fancy values upon the property in controversy, but the law requires you to determine the reasonable market saleable value of the property if the owner was offering to sell on the usual terms and the purchaser desired to buy."

In this the jury were instructed that under the law they were required to fix the damages at such a sum as the owner, desiring to sell, could at the time secure from a purchaser who desired to buy, and informed them that they could not allow or fix speculative, boom or fancy values. This is the law as we understand it, and we think the jury could not have been misled by the language used. While in the abstract this court does not approve of the word "boom" as a word de-

scriptive of values which should not be considered by a jury in estimating values arising under the law of eminent domain, yet as the word was used in the instruction complained of we are unable to determine that there was error committed justifying a reversal of this case, and, especially where, as in this case, other instructions, particularly the second, makes the meaning of the court clear that the fair market value of the property at the time should be made the basis of the jury's consideration of damages, and uses language easily comprehended by them.

The third assignment of error is that the court erred in rejecting the evidence of offers to purchase other property in the neighborhood of the land in question about the time of the condemnation proceedings. We do not think the evidence offered in this case brought it within the rule applicable to that class of evidence. Actual sales of adjoining or abutting property at or about the time of the taking by condemnation is a widely different proposition, and even this class of evidence is received wth very great caution. In *Keller v. Pane,* 34 Hun 177, cited in Am. & Eng. Enc. of Law, vol. 10, page 1154, it is said:

"If evidence of offers is to be received it will be important to know whether the offer was made in good faith, by a man of good judgment, acquainted with the value of the article, and of sufficient ability to pay; also whether the offer was cash or credit, or in exchange, and whether made with reference to the market value of the article or to supply a particular need or fancy."

The evidence failed to show the existence of any of these conditions, and we think the evidence was rightfully rejected.

It is further contended by the plaintiff in error that the court erred in the fourth instruction, in which said instruc-

tion the court permitted the jury to exercise their judgment, based upon their inspection of the premises, and the evidence submitted upon the trial. We are unable to agree with counsel in this contention.

In instruction No. 4 the court after adverting to the evidence before the jury, and the elements which entered into a correct determination of the elements of damage in the case, then proceeds:

"All of these matters are proper for your consideration in determining the reasonable market value of the property, at the time it was taken, and the damages, if any, to the remaining lot, but you are not bound by this evidence alone. You have been permitted to make a view and inspection of the property in question and you have a right to exercise your own judgment, based upon your inspection and observation, together with all the evidence which has been permitted to go to you during the trial. Remember, all this evidence and your own observation is for the purpose of enabling you to form a correct judgment as to the reasonable market value of these lots March 21, 1902, and the depreciation in value, if any, of the remaining lot, caused by the excavation made by the railroad company on the lots that it took from Mr. Blincoe, and in your deliberations, you must consider all the evidence that you believe credible, and give it such weight as in your judgment you deem it entitled to."

Counsel for both plaintiff and defendant have examined and discussed this subject with commendable energy and zeal, and have collected and presented the conflicting decisions of the courts to such extent that there is little left for this court to do further than to announce the guiding principle which seems to run through the great mass of authority on the subject.

Extreme views have been expressed upon both sides, but we think the great weight of authority has adopted the medium ground followed by the court in this case, viz: not to permit the jury to view the premises and therefrom determine all the questions involved in the case, to the exclusion of the sworn testimony of all the witnesses in the case; nor on the other hand to shut their eyes to and their consciousness of all the physical facts plainly before them, but rather that they make use of their vision to more clearly and certainly understand the physical facts testified to by the witnesses and thus the better be able to weigh and assign to each the measure of truth to which he intended to testify, and thereby, in that respect, assign to the several witnesses the measure of credence which they thus find their evidence entitled to.

We have spoken of physical facts because we believe it is only as to physical facts that this view of the jury is permitted. The jurors are generally strangers to both the parties and to the premises involved, and certainly a stranger wholly unacquainted with the value of property in that vicinity, and seeing only the physical effect upon the premises in the way of cuts or fills, could not be permitted to indulge his own arbitrary whim or notion of the value of the premises thus affected, and the measure or amount of damages thus occasioned; but it does not follow that they may not correct an erroneous impression or false statement of a witness as to a physical fact by their own personal observation. As illustrated by some of the authorities, suppose a witness testified that a certain cut made by a railroad is eighteen feet deep and the jury viewing the premises and standing in the cut are yet able to overlook the bank, and thus know that the cut is less than the height of an ordinary person; must the

jury in such case disregard the evidence of their eyes and still believe that the cut is eighteen feet deep? If such were the law it is pretty safe to assume that no jury of intelligent American citizens would ever administer the law. It is assumed that the instruction given warrants the jurors in basing their verdict on the knowledge gained at the view, in disregard of the testimony given in court, if they so desire. This assumption is unwarranted by the language employed. The language of the instruction is: "And you have a right to exercise your own judgment, based upon your inspection and observation, together with all the evidence which has been permitted to go to you during the trial." We think the instruction was not erroneous.

In reaching this conclusion it is not necessary to hold or endorse the theory that the jury are not bound by the testimony of the witnesses, but may rest their verdict entirely upon the information obtained at the view; neither are we inclined to go to the other extreme and hold that the jury are not to take into consideration, in any degree, the evidence of their own senses. We incline rather to accept the middle ground adopted by the supreme court of Kansas, Wisconsin and other authorities in which it is said:

"The evident theory and intention of the legislature was that cases would arise in which it would be necessary and proper that the evidence offered in the court should be supplemented by the knowledge gained by the jury from a view. It would be impracticable and foolish to require a court, after having sent a jury to view the property or place, to direct them not to consider what they had there observed, and what was obvious to all who might look." *City of Topeka v. Marlineau,* 22 Pac. 419.

And in *Washburn v. Railroad Co.* 59 Wis. 18 N. W. 323, the supreme court of Wisconsin say:

"We understand that the object of a view is to acquaint the jury with the physical situation, conditions and surroundings. What they see, they know absolutely. If a witness testify to anything, which they know by the evidence of their senses, on the view, is false, they are not bound to believe, cannot believe the witness, and they may disregard his testimony, although no other witness has testified on the stand to the fact as the jury know it to be. For example, if a witness testify that a certain farm is hilly and rugged, when the view has disclosed to the jury and to every juror alike that it is level and smooth, or if a witness testify that a certain building was burned before the view and the view discloses that it has not been burned, no contrary testimony of witnesses on the stand is required to authorize the jury to find the fact as it is, in disregard of the testimony given in court."

We therefore conclude that the information obtained at the view as to these mere physical facts, is evidence to be considered in connection with all that it offered in court; but the evidence which the jurors acquire at the view is not to be elevated to the character of exclusion or predominating evidence, * * * * but simply give it place along with the other evidence in the case in their deliberations." *C. K. & W. Ry. Co. v. Parsons*, 32 Pac. 1083.

For the error in refusing evidence in reference to the expense of moving the lumber, and repeated in instruction No. 10, wherein the jury are told they must not allow the plaintiff in error anything for the expense of removing the lumber from lots 3 and 4, the judgment of the court below must be reversed, and the cause remanded for a new trial

therein, the costs of this court to be taxed to defendant in error.

Burford, C. J., who presided in the court below, not sitting; all the other Justices concurring.