BALTIMORE GAS AND ELECTRIC COMPANY *v.*
STATE ROADS COMMISSION OF MARYLAND

[No. 227, October Term, 1956.]

*Decided July 26, 1957.*

*Motion for rehearing filed August 26, 1957, denied September 24, 1957.*

The cause was argued before BRUNE, C. J., and COLLINS, HENDERSON, HAMMOND and PRESCOTT, JJ.

*Clarence W. Miles* and *William Baxter,* with whom were *Alfred P. Ramsey* and *Paul S. Clarkson* on the brief, for the appellant.

*Joseph D. Buscher, Special Assistant Attorney General,* and *Richard W. Case,* with whom were *C. Ferdinand Sybert,*

*Attorney General, Herbert F. Murray* and *Clark, Smith & Prendergast* on the brief, for the appellee.

HAMMOND, J., delivered the opinion of the Court.

Unless the Legislature directs to the contrary, the rule is that a public utility must, at its own expense, remove and relocate its service facilities in, on or under a public road or other land owned by the State if this is made necessary by improvement or extension of the road system. The question before us is whether the Legislature, in authorizing the State Roads Commission to build toll bridges, tunnels and motorways by the enactment of Chap. 561 of the Acts of 1947 (now found in Code, 1951, as Art. 89B, Secs. 106-126, both inclusive, hereinafter sometimes referred to as "the statute") changed this common law rule as to relocations required by the construction of revenue projects.

The State Roads Commission is constructing a tunnel under the Patapsco River in Baltimore Harbor, with approaches on both sides, as a revenue bond project known as the Harbor Crossing. The construction of the tunnel required the removal of four armored submarine cables of the Baltimore Gas and Electric Company from one part to another of the bed of the Patapsco River, which, it is agreed, is owned by the State. The construction of the approaches to the tunnel necessitated the removal and relocation of various utility service facilities of the Company, both electric and gas, that it had put "in, on, over and under certain public highways, streets, alleys and places", under various of its franchises.

It was agreed (a) that the Company would remove the old cables and install new cables at a place in the bed of the Patapsco River outside the working area, approved by its engineers and the consulting engineers for the Harbor Crossing; (b) that the Commission would advance the cost of the work, including the cost of acquiring new rights of way on private property where necessary, on vouchers audited and approved by the consulting engineers; (c) that the legal question of the ultimate liability for the costs would be submitted to appropriate courts. The Commission promised that

even if the Company were held to be liable, it would pay "for the cost of acquiring new .rights of way over, under or through private property" made necessary by the new location of the cables. If the Commission had to pay the cost of the new cables, the Company agreed to refund the difference between the depreciated value of the old cables and the value of the new.

Similar arrangements were entered into as to utility service facilities that had to be changed or rebuilt because of the construction of the roads approaching the tunnel. The Company agreed to do the necessary work according to plans approved by the consulting engineers. The Commission agreed to advance the costs from time to time as the work progressed, on vouchers audited and approved by the consulting engineers, and the ultimate liability for payment was to be decided, as in the case of the cable expenses, by the courts. If the Company were found responsible, it was to repay the Commission. If the decision made the Commission liable, the Company would retain the advances and, in addition, be paid what it had expended to acquire "private rights of way or other real property" to take the place of the publicly owned property it had been forced to vacate.

The building of the Harbor Crossing affected utility facilities, other than the submarine cables, in various ways. There is no dispute as to those that had to be moved from private property of customers or of the Company, for the Commission has conceded it must pay for these. It is the ones located in, on or under public highways that are before us. Some of these had to be moved to newly acquired private property. Some had to be reconstructed at the same location or at another location on the public highway. Others had to be disconnected and temporary facilities built, to be used until the project had been completed, when the original facilities could be reconnected. Another category consisted of electric cables located in municipally owned ducts or conduits which had to be moved to other similar conduits. Gas mains under the roads had to be raised or lowered. Some tangible personal property was physically damaged or destroyed but its value was a very small part of the total expense of the

Company. Some tangible personal property was abandoned, but the Company makes no claim "for the cost or the value of the facilities disconnected or abandoned" and asks to be reimbursed "only for the labor and material cost and expenses incurred * * * in disconnecting and capping service facilities at such point of disconnection."

To carry to court the question of who must pay, the parties chose as a vehicle a petition for a declaratory judgment by the Commission, with numerous exhibits, and an answer by the Company, with many more exhibits. In these pleadings and exhibits were set forth the matters, facts and circumstances that have been recited and the respective claims of the parties. The Commission moved for summary judgment on the ground that the petition and answer, and the exhibits, showed "no genuine issue as to any material fact", and the parties agreed that the court could enter a summary judgment for the Commission or for the Company. The trial court decided that the Company must pay, finding that the Legislature had not intended to change, and had not changed, the common law rule, on the strength of cases such as *Transit Commission v. Long Island R. Co.* (N. Y.), 171 N. E. 565; *New York Tunnel Authority v. Consolidated Edison Co.* (N. Y.), 68 N. E. 2d 445; and *New Jersey Bell Telephone Co. v. Delaware River Joint Commission* (N. J.), 15 A. 2d 221, which had held that statutory authorization to buy or condemn did not make either mandatory or require the payment of compensation for property damaged but not taken.

Seemingly alarmed at Judge Byrnes' reliance, in deciding against it, on the emphasized premise that the only issue was liability for the agreed cost of the removal, relocation and reconstruction of the gas and electric utility facilities, the Company has argued in this Court that the gas mains and the electric pipes, poles, wires, underground and submarine cables and appurtenant service facilities were literally physically damaged and destroyed and that it is entitled to its compensation for such physical damage and destruction. The Commission contends that the point does not arise on the pleadings and exhibits and was not attempted to be raised below, and the Company counters both claims. It is clear to us that

the Commission is right and that the case was submitted and argued below on the agreed premise on which Judge Byrnes based his decision, and that the question of literal physical damage to, or destruction of, tangible personal property entered the case for the first time on appeal. We have considered and decided the matter on the basis on which it was considered and decided below.

The Commission and the Company agree that the controlling part of the statute is the paragraph of Sec. 120 reading: "All private property damaged or destroyed in carrying out the powers granted by this sub-title shall be restored or repaired and placed in its original condition as nearly as practicable or adequate compensation made therefor * * *." Its meaning and the general legislative purpose and pattern come clear on a reading of the statute from start to end. The cost of a bridge, motorway or tunnel is to be paid for in full out of proceeds of sale of the revenue bonds, not the obligations of the State, sold to finance it. ("Cost" includes not only direct costs but also expenses "necessary or incident to the construction".) No individual, corporation or political subdivision or agency is to be put to expense by the building of a project, either individually or as a taxpayer—rather, the users of the project are to pay all costs by their tolls. All real and personal property and interests therein, public or private, used in a project are to be acquired in the name of the State, either by purchase or by condemnation. All public property "damaged" in the doing of the work is to be restored or repaired to its original condition, and all private property "damaged or destroyed" is either to be restored to its original condition, as nearly as may be, or the owner paid "adequate compensation". The only individual or entity, public or private, not to be paid for the contribution of property to the project is the State of Maryland, which expressly is to receive no compensation for any of its "public lands, playgrounds, parks, parkways or reservations". The Commission is given the power to construct grade separations at road intersections and to change the location of public highways but it is told specifically that if it does either, it must pay both the cost and any damages incurred "as part of the cost of such project."

If the Commission damages private property in the course of arranging grade separations or relocating roads, it must, under Sec. 120, restore it or pay compensation, as a part of the cost of the particular work and, in turn, of the cost of the project.

It is clear that Sec. 120 puts an obligation on the Commission, as an agency to whom the State has delegated the police power necessary for the doing of the work authorized, that it would not bear otherwise. Assuming for the purpose of discussion that Sec. 120 does not embrace or extend to the service facilities of utilities on State-owned land, that obligation is to make whole the owners of all other private property injured in the construction of a project, even though the injury, at common law, would be *damnum absque injuria* because it did not amount to a taking (as, for example, in *Baltimore v. Himmelfarb,* 172 Md. 628). If the words in Sec. 120, read in context, do not mean this much, the Legislature must be credited, as it is not to be, with having passed a meaningless provision.

Decisions elsewhere support this conclusion. In *Ewalt v. Pennsylvania Turnpike Commission* (Pa.), 115 A. 2d 729, Ewalt owned a lake well stocked with fish and other aquatic life. As a result of erosion caused by the construction of the Philadelphia extension of the Pennsylvania Turnpike, large quantities of dirt were carried into the lake. The Supreme Court of Pennsylvania, noting that the damages were consequential and not direct, and as such non-compensable in the absence of a statute to the contrary, held that the identical Pennsylvania counterpart of Sec. 120 was such a statute and required the commission to compensate Ewalt. In *United States Gypsum Co. v. Mystic River Bridge Authority* (Mass.), 106 N. E. 2d 677, the provision of the Act creating the toll authorities that matched Sec. 120, read: "Any person damaged in his property by the exercise of any of the powers granted by this act may recover his damages from the authority * * *." In constructing a toll bridge, the authority erected a pier on the navigable part of the Mystic River, the bed of which was owned by the Commonwealth. The pier blocked access by water to the wharf of the Gypsum Co. It was con-

ceded that neither the Constitution of the United States, that of Massachusetts, nor the common law required the payment of compensation for the damage done, since there was no taking of the wharf property and the loss of use to the property owner was *damnum absque injuria*. The Supreme Judicial Court of Massachusetts upheld the award of the jury, saying: "The damages caused by the erection of the pier come within the description in the act of the damages for which compensation is to be made." The same conclusion was reached in *City of Philadelphia v. Commonwealth* (Pa.), 130 A. 491, as to the damage to riparian rights that were revocable at will, caused by the construction of a bridge.

The Commission concedes that if private property, other than that of a utility, located in, on or under State-owned land, is damaged but not taken in the course of the building of a bridge, motorway or tunnel, Sec. 120 requires the payment of compensation for the damages that otherwise would be incidental or consequential and, so, *damnum absque injuria*. Its earnest argument is that there is a fundamental difference between statutes, on the one hand, that merely extend to owners of property damaged consequentially, and not directly, the right to compensation enjoyed by owners of property taken, and statutes, on the other "which deny to the State the police power with respect to public utility facilities located on the public domain * * *."

Section 120, the Commission claims, has nothing whatever to do with "a denial of the police power". It agrees with the Company that there is no case squarely holding that a legislature, in passing a provision like Sec. 120, either meant to, or did not mean to, abrogate the common law rule that a utility company must pay the expense of relocating its facilities in the streets when the public interest requires it. The Commission finds the decision of the New York Court of Appeals in *New York Tunnel Authority v. Consolidated Edison Co.*, 68 N. E. 2d 445, *supra,* the most analogous authority favorable to it, because the question as to who should pay was directly at issue, the costs of the project were paid from the sales price of revenue bonds and the statutory provisions

are said to be specific and compelling in protecting property rights. The law under which the authority was proceeding said it should acquire by purchase or condemnation property necessary or convenient for its purposes, including real property of public utility corporations. The term "real property" was defined as including "* * * easements * * * uses * * * licenses * * * and also claims for damage to real estate." The Court noted that if the common law rule that public utility corporations are bound to relocate their facilities whenever public interest requires, is not to apply, "* * * the distinction must lie in the nature of the project, the character of the authority, or the intent of the Legislature as shown by the enabling statute." The New York rule is that if the project is proprietary and not governmental the utility must be compensated for its cost of removal.[1] The Appellate Division had held that the Tunnel Authority was acting in a proprietary capacity but the Court of Appeals disagreed and, it would seem, decided the case largely on this point. To the contention that the legislative intent was otherwise, the Court gave the short answer that the contention had no merit, citing, as did the trial court in the case at bar, *New Jersey Bell Telephone Co. v. Delaware River Joint Commission* (N. J.), 15 A. 2d 221, *supra,* and similar cases in which it had been held that the authorization to purchase or condemn property did not require its purchase or the payment of compensation for consequential damages. We do not find the case persuasive, and even in New York its force may have been greatly weakened by *In re Gillen Place, Borough of Brooklyn, City of New York* (N. Y.), 106 N. E. 2d 897, in which Judge Fuld, who wrote the opinion in the *Tunnel* case, dissented vigorously.

In arguing that no legislative intent to change the common law rule as to public utilities can be found in Sec. 120, the Commission relies strongly on Chap. 437 of the Acts of 1955, providing for the construction of the Northeastern Expressway as a revenue project, now found in Code, 1956 Supp.,

---

1. For example, construction work in connection with the New York subway was held to be proprietary in nature. *City of New York v. New York Telephone Co.* (N. Y.), 14 N. E. 2d 831.

Art. 89B, Secs. 126A to 126V. Sec. 126-O contains a paragraph identical to the critical one in Sec. 120. Sec. 126E says, *inter alia,* that whenever the Commission requires the facilities of a public utility to be relocated or removed in the construction of the expressway, "* * * the cost of removal or relocating of such facilities, or of installing such facilities in a new location, and the cost of any lands, or any rights or interest in lands, and any other rights acquired to accomplish such relocation or installation, shall be ascertained and paid by the Commission as a part of the cost of the Expressway." The Commission contends that if the Legislature had thought that Sec. 120 applies to the costs incurred in relocating facilities of public utilities, it would not have inserted the explicit provisions of Sec. 126E just quoted in the Northeastern Expressway Act. We were told at the argument that at the time these provisions were put in the 1955 Act by amendment, the dispute that existed between the Commission and the Company was made known to the Legislature and that the amendment was offered by the public utilities so that no room would exist for future dispute. Under the circumstances, we think no controlling significance can be given to the difference in the language of the two Acts.

We find no force in the Commission's attempt to limit the effect of Sec. 120 so that it does not reach the private property of public utilities, on the ground that to interpret it as going so far would be finding a legislative intent to take from the Commission the police power that had clearly been delegated to it. Sec. 120 does not take from the Commission the right or the power to decide what project is to be built, or how; no more does it shackle its right and power to make a public utility move its facilities if they are in the path of construction. It merely says that the policy of the State is to pay for the cost of removal and relocation from funds of the project. Quite apart from this, the police power essentially is no more than the power to govern. All constitutions presuppose its existence and functioning and, in turn, its exercise must be within the bounds of constitutional provisions. The right to take property for public use is as much dependent on the police power as the right to injure it in the public interest. It

is because that part of the police power known as the power of eminent domain specifically is subject to constitutional restraints and limitations that the State must pay for property taken for public use. Absent constitutional requirements, there would be no more obligation to pay for property taken than for property damaged. 2 *Willoughby on the Constitution,* pages 1231-2 (Note 5). It is there said: "In the absence of such constitutional provisions, express and implied, the individual thus deprived of the property would have no legal claim for damages. To the author it appears proper to group the power of eminent domain under the general police powers of the State." 1 *Orgel on Valuation under Eminent Domain,* Sec. 1, page 8, says: "The older legal writings made the familiar traditional distinction between the power of eminent domain, which is assumed to be concurrent with an obligation to make compensation, and the police power, which is assumed to represent (along with the power of taxation) the power of government to impose injuries on property without the payment of indemnity. The distinction as thus formulated is almost useless, as it fails to suggest what acts will be regarded as coming under the police power and what acts as coming under the power of eminent domain."

There is no esoteric or sacred difference—if there is any significant difference—between the police power of the State to injure the rights of property of a utility without paying for the injury and the State's power to so injure the rights of property of every other owner. Cases that have imposed the common law burden on the utility sometimes have relied on an implied limitation or condition that the company will move its facilities at its own expense if the public interest requires moving but, as we see it, the bedrock basis for the police power to require the moving of utility facilities without paying compensation, is that the State does not take property within the meaning of the Constitution and, therefore, is not required to pay. Because it has not taken the property, the damage to the owner is consequential or incidental, just as is the damage to one abutting a newly built or improved road or bridge whose property is not taken but merely damaged. In both cases the common law rule has been that the loss to

the owner was *damnum absque injuria*. Judge Markell said for the Court in *Capital Transit Co. v. Bosley*, 191 Md. 502, 514: "The 'police power', at most, is the power of government. Exercise of this power sometimes causes uncompensated expense. But the State itself cannot under the guise of the police power take private property for public use without compensation." The Supreme Court said in *Chicago, B. & Q. R. Co. v. Illinois ex rel. Drainage Com'rs*, 200 U. S. 561, 50 L. Ed. 596: "Private property cannot be taken without compensation for public use under a police regulation relating strictly to the public health, the public morals or the public safety, any more than under a police regulation having no relation to such matters, but only to the general welfare. The foundations upon which the power rests are in every case the same." Mr. Justice Holmes, in *Pennsylvania Coal Co. v. Mahon*, 260 U. S. 393, 67 L. Ed. 322, 325, 326, put it thus: "As long recognized, some values are enjoyed under an implied limitation and must yield to the police power. But obviously the implied limitation must have its limits * * *. One fact for consideration in determining such limits is the extent of the diminution. When it reaches a certain magnitude, in most if not in all cases there must be an exercise of eminent domain and compensation to sustain the act."

The fact that the utility must bear the cost of relocation of its facilities located on State property, if called upon to do so in the construction of public works, because the expense to which it is put does not amount to a taking of the property in a constitutional sense, is recognized in the cases relied on by the Commission. In *New Jersey Bell Telephone Co. v. Delaware River Joint Commission* (N. J.), 15 A. 2d 221, *supra*, the holding was that the telephone company must pay the cost of relocation of its facilities since the statute merely authorized purchase or condemnation and did not change the common law rule. The Court said that it was "* * * not moved to the conclusion that compulsion may lawfully be put upon the Commission to condemn as a method of reimbursement. The relator's loss, in our view, was consequential. * * * There was no taking or acquisition of real property within the meaning of the compact, the statutes or the cases."

The leading case of *New Orleans Gas Light Co. v. Drainage Commission of. N. O.,* 197 U. S. 453, 49 L. Ed. 831, 835, upheld the common law rule that a utility must, without compensation, move its facilities from public property. There the Court restated the rule that "uncompensated obedience to a regulation enacted for the public safety under the police power of the State was not taking property without due compensation" and added: "In our view, that is all there is to this case." The Court concluded: "In complying with this requirement at its own expense none of the property of the gas company has been taken, and the injury sustained is *damnum absque injuria."*

As we read the statute, we see no reason why the words of Sec. 120 should not apply with as much force to private property of a utility in, on or under the public domain, as to any other private property. We find a clear legislative intent that all costs of or incident to a project, including the payment for all injuries to property that would have been *damnum absque injuria* at common law, are to be paid from the proceeds of sale of the revenue bonds sold to finance the project.

The statute indicates that the Legislature did not use the term "property" in a narrow or restricted sense. Throughout there are found references to lands, structures, franchises and easements as illustrative of property rights. For example, Sec. 120 itself refers to "any real property or tangible or intangible personal property". This Court noted in *Friendship Cemetery v. Baltimore,* 197 Md. 610, 617, "* * * that while the term 'property' was applied in common parlance to a tract of land, it actually means in law 'the rights of the owner in relation to it.' "

The Company has suffered injury to its rights as owner of both intangible and tangible private property, in, on or under the public roads. *Consol. Gas Co. v. Baltimore City,* 101 Md. 541, held that when a public utility exercises its franchise by installing tangible personal property in the streets, it brings into being an easement—an incorporeal hereditament—that may be the subject of taxation on an assessment measured not only by the value of the tangible personal property so em-

ployed, but by the value of the resulting easement. In the case of *In re Gillen Place, Borough of Brooklyn, City of New York* (N. Y.), 106 N. E. 2d 897, *supra,* the statute provided for " 'Compensation and recompense * * * to the respective owners of the real property affected or damaged by reason of' " the closing of the street. Real property was defined as including " '* * * *all easements and hereditaments,* corporeal or *incorporeal* * * *' ". The Court noted that in New York "* * * it is settled that both the tangible property and the intangible right together constitute the estate created by special franchise" and said that "Such estate is an incorporeal hereditament, in the nature of an easement in the street wherein the installation is made * * *." It was held that the closing of the street entitled the utility to damages "* * * properly measured not merely by the intrinsic value of the pipes and conduits in the soil, but by the actual loss to claimants of the right to unobstructed passage through the street in question", noting that to separate the items of tangible property from the franchise by taking away the street privilege, in effect, destroyed the tangible property.

The Company makes no claim for loss of, or damage to, any franchise or easement. It says that its rights of ownership in relation to the tangible service facilities were damaged and destroyed. These rights included the right to use the facilities to afford service to its customers and the public and to the consequent revenues produced. Because the exercise of the police power by the Commission compelled a cessation of the use of the facilities until they were moved or new facilities substituted for them, the greater part or all of their value to the owner—its property rights in relation to them— was damaged or destroyed. Ordinarily, in this situation, the Company could demand no recompense for the expense it was put to by the State because, in the eyes of the law, it still had its franchise and it still had the tangible personal property and, so, there had been no taking which required compensation. Section 120, however, says that the Commission must restore or repair the damaged rights of the Company, just as the Massachusetts statute required the Bridge Authority, in the *Mystic River* case, *supra,* to pay the Gypsum

Company for the loss of its ability to use the wharf for the purpose for which it was owned—although the owner still had the wharf and still had the abstract right to use it. We find no difference in the application of Sec. 120 to the two situations.

The question of the measure of damages was, in effect, stipulated. The Commission is given ample power and wide discretion by the statute as to the amount it will pay for property necessary or convenient in the construction or operation of a project. The amount that the Commission was willing to pay, if it was liable to make payment, was agreed upon, and the necessity for, and the correctness of the amount spent was checked and approved by the consulting engineers. The measure of damages agreed to was the cost of moving the facilities that could no longer be used where they were to a place where they could again be of service and produce revenue for their owner, less any added value of the new facilities and any salvage value of the old.[2] Support for the propriety and reasonableness of the Commission's agreement to pay for new rights of way on private property is found in the provisions of Sec. 111 of the statute that the Commission may condemn any "lands * * * rights, rights-of-way, franchises, easements and other property of any person * * * public utility or other corporation * * * necessary in the restoration of public or private property damaged or destroyed," especially since, if they did not, they would be damaging or destroying a franchise. Although the authorities are not uniform, the Commission could have found further support for its agreement to pay the expenses attributable to relocation and reconstruction in the opinion of Courts in cases of condemnation of real estate in which the moving of personal property was necessitated. The cost of such moving has been held to be a

---

2. This is substantially the measure used in the Federal-Aid Highway Act of 1956. U. S. C. A., Title 23, Sec. 162. Paragraph (c) of this section reads: "For the purposes of this section, the term 'cost of relocation' shall include the entire amount paid by such utility properly attributable to such relocation after deducting therefrom any increase in the value of the new facility and any salvage value derived from the old facility."

proper element of damage where the constitution or statutes of the State make it responsible for injury to property as well as for its taking. 2 *Nichols on Eminent Domain,* Third Ed., Sec. 5.84; 1 *Orgel on Valuation under Eminent Domain,* Sec. 70 (see, too, Secs. 77, 78, 79), *supra; Blincoe v. Choctaw, O. & W. R. Co.* (Okla.), 83 P. 903; *City of Richmond v. Williams* (Va.), 77 S. E. 492, 494; *Harvey Textile Co. v. Hill* (Conn.), 67 A. 2d 851. In the Virginia case the statute allowed compensation for damages to land or "other property". On the land taken was stored a quantity of lumber that had to be moved because of the condemnation. The Court said: "* * * we think it plain that, in compelling its owner to remove it, a burden was imposed which diminished the value of the lumber and damaged its owner." In the Connecticut case, the statute required the highway commissioner, in taking any land he found necessary for a trunk line highway, to pay the owner "for all damages". The commissioner took land and a factory building. The owner claimed the $5,000 cost of disassembling, moving and reassembling the machinery in the factory. The holding was that the trial court had erred in fixing damages on a basis which excluded the element of the cost of moving and reassembling the personal property.

The conclusions we have reached make it unnecessary to consider the question of whether the Company had riparian rights in, or in relation to, the cables that would give it a special ground for relief, and require that the judgment below be reversed.

> *Judgment reversed and case remanded for the entry of a judgment in conformity with the opinion herein. The appellee will pay the costs, other than the cost of the appendix to the appellee's brief (which relates to the question raised by appellant for the first time on appeal), which is to be paid by appellant.*