OSCN Found Document:PERRY v. GRAND RIVER DAM AUTHORITY

 
 
 

 
 
 
 
 
 
 
 

 


 
 
 
 
 
 


 
 OSCN navigation


 
 
 Home

 
 Courts

 
 
 Court Dockets
 

 
 Legal Research

 
 Calendar

 
 Help
 
 





 
 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only
 
 
 
 
 

 
 
 
 PERRY v. GRAND RIVER DAM AUTHORITY
2015 OK CIV APP 12
344 P.3d 1
Case Number: 109714 Consol w/109715; 109716
Decided: 12/31/2013
Mandate Issued: 02/13/2015
DIVISION IV
THE COURT OF CIVIL APPEALS OF THE STATE OF OKLAHOMA, DIVISION IV
Cite as: 2015 OK CIV APP 12, 344 P.3d 1

 

ROBERT and BRENDA PERRY, DAVID and STACY PRYOR, and JOHN and 
JANET SHAW, Plaintiffs/Appellees; Counter-Appellants,
and
ROBERT ASBELL 
and TERESA ASBELL, et al., Plaintiffs,
v.
GRAND RIVER DAM AUTHORITY, 
Defendant/Appellant; Counter-Appellee.

APPEAL FROM THE DISTRICT COURT OF
OTTAWA COUNTY, OKLAHOMA
HONORABLE ROBERT E. REAVIS, TRIAL JUDGE

REVERSED AND REMANDED FOR FURTHER PROCEEDINGS 
CONSISTENT WITH THIS OPINION

N. Larry Bork, Mary E. Christopher, GOODELL, STRATTON, EDMONDS & PALMER, 
L.L.P., Topeka, Kansas, and Scott R. Rowland, Renee DeMoss, GABLE GOTWALS, 
Tulsa, Oklahoma, for Plaintiffs/Appellees
Joseph R. Farris, Belinda Aguilar, 
Millicent L. Hughes, FELDMAN, FRANDEN, WOODWARD, FARRIS & BOUDREAUX, Tulsa, 
Oklahoma, and Phil R. Richards, Whitney R. Mauldin, Randy Lewin, RICHARDS & 
CONNOR, Tulsa, Oklahoma, for Defendant/Appellant


JERRY L. GOODMAN, JUDGE:
¶1 Grand River Dam Authority (GRDA) appeals the trial court's orders awarding 
damages in inverse condemnation to Robert and Brenda Perry (Perrys), David and 
Stacy Pryor (Pryors), and John D. and Janet M. Shaw (Shaws). Perrys, Pryors, and 
Shaws counter-appeal the court's ruling denying their request for damages for 
personal property.[1]
FACTS
¶2 The Grand River Dam Authority (GRDA) was created by the State of Oklahoma 
for the purpose of constructing the Pensacola Dam on the Grand River to create 
the Grand Lake O' the Cherokees (Grand Lake) which is an impoundment of waters 
flowing from the Neosho and Spring Rivers and their tributaries into Grand 
River. The dam and resulting lake provide flood control, electricity, water, 
recreation, and irrigation for the affected watersheds. GRDA is regulated by the 
Federal Energy Regulatory Commission (FERC) and from its inception has possessed 
the power of eminent domain. Pursuant to this power, GRDA obtained flowage 
easements on real property to an elevation of 760 feet NGVD, an elevation 
related to sea level.[2]
¶3 Perrys, Pryors, and Shaws (collectively "Landowners") own real property 
above 760 feet NGVD on Grand Lake. In October 1986 (1986 flood), Shaws' property 
sustained flooding.[3] Subsequently, Perrys, Pryors, and Shaws' properties 
flooded in September 1993 (1993 flood), April 1994 (1994 flood), and June 1995 
(1995 flood). On October 5, 2001, Perrys, Pryors, and Shaws, as well as a number 
of other landowners, filed suit against GRDA for inverse condemnation.[4] GRDA denied any 
taking had occurred.
¶4 GRDA subsequently filed a motion for summary judgment, asserting 
Landowners' claims for damage to real and personal property were time-barred by 
12 O.S.2011, § 95. Landowners disagreed, asserting issues of limitations, 
damages and causation had been resolved in Dalrymple, et al. v. Grand River 
Dam Authority, CJ-94-444 (Dalrymple), wherein 100 landowners filed 
suit against GRDA for injury to their property resulting from flooding from the 
Pensacola Dam. Therein, the trial court adopted the findings of the court 
appointed referee, hydrologist Dr. Forrest Holly, Jr., who determined, inter 
alia, that "the existence and operation of Pensacola Dam caused a 
quantifiable increase in the magnitude and duration of flooding above 760 feet 
NGVD. ." (Holly Report.) In the present case, the trial court adopted the Holly 
Report, finding the same recurring floods at issue in Dalrymple are at 
issue in the present case.
¶5 On May 14, 2010, the trial court granted GRDA partial summary judgment, 
finding Landowners' personal property claims were time-barred by 12 O.S.2011, § 
95(A)(3). Subsequently, by order filed on June 28, 2011, the court made separate 
findings of fact as to each Landowner's inverse condemnation claim.
With respect to the Perrys, the court found:

 
 The property was subject to flooding in 1993, 1994, and 1995. All of the 
 flooding above 760 feet NGVD was caused by the existence and operation of 
 the GRDA Dam. After each flood, Perrys cleaned and restored their residence. 
 Perrys sold the property in 2001.
 GRDA interfered with the use and enjoyment of the property and thereby 
 took a flowage easement upon all of the Perrys' property to an elevation of 
 771 feet NGVD. The court established the date of taking as April 7, 1994, 
 finding the 1994 flood reached the highest elevation. The court awarded just 
 compensation of $32,990.00 for diminution in value, restoration costs as to 
 all floods, and for the flowage easement taken.
With respect to the Pryors, the court found:

 
 The property was subject to flooding in 1993, 1994, and 1995. All of the 
 flooding was caused by the existence and operation of the GRDA Dam. On each 
 occasion, Pryors cleaned and restored their property.
 The property also flooded in 1986 to a depth of five feet. The court 
 accepted the Mussetter Report, which attributed three and one-half feet of 
 that flood to natural causes and the balance to the GRDA Dam operation.[5] However, 
 Pryors did not acquire the property until 1989. Pryors sold the property in 
 2005.
 A temporary taking from 1993 to 1995 and awarded just compensation of 
 $60,850.00 for restoration costs and diminution in value of the 
 property.
For the Shaws, the trial court found:

 
 The property was subject to flooding in 1993, 1994, and 1995, and the 
 flooding was caused by the existence and operation of the GRDA Dam. The 
 property was also flooded in 1986 to a depth of four feet. The court 
 accepted the Mussetter Report, which found 50% of the flooding was due to 
 natural causes and 50% to the GRDA Dam operation.
 Shaws' restored their property after each flood. However, after the 1995 
 flood, the Shaws abandoned the property, retaining title to the 
property.
 A fee title was taken on June 2, 1995, and awarded just compensation of 
 $114,850.00 for restoration costs and diminution in value of the 
 property.
¶6 GRDA appeals the judgments awarding Landowners damages of just 
compensation. Landowners counter-appeal the court's ruling that their personal 
property claims were barred by the two-year statute of limitations under 12 
O.S.2011, § 95(3).
STANDARD OF REVIEW
¶7 In inverse condemnation cases, whether there is a taking and the amount of 
damages are questions of fact for the trier of fact. Therefore, the judgment of 
taking and amount of damages will be affirmed if supported by any competent 
evidence. Material Serv. Corp. v. Rogers Cty. Bd. of Comm'rs, 2012 OK CIV APP 
17, ¶ 5, 273 
P.3d 880, 883.
ANALYSIS AND REVIEW
A. Condemnation
¶8 Condemnation, also known as eminent domain, is the power to take private 
property for the public good. Williams v. State ex rel. Dept. of Transp., 
2000 OK CIV APP 
19, ¶ 13, 998 
P.2d 1245, 1248 (citing Harn v. State ex rel. Williamson, 1939 OK 40, 87 P.2d 127). The 
right of condemnation is a fundamental attribute of the sovereign state. City 
of Tahlequah v. Lake Region Elec., Co-op., Inc., 2002 OK 2, ¶ 7, 47 P.3d 467, 471. Eminent domain 
generally refers to legal proceedings in which the state or other authorized 
entity asserts its authority to condemn property for public use. 
Williams, 2000 OK CIV APP 19, at ¶ 15, 998 P.2d at 1249. Conversely, "[i]nverse condemnation 
is an action brought by a property owner seeking just compensation for land 
taken for a public use, against a government or private entity having the power 
of eminent domain. It is a remedy peculiar to the property owner and is 
exercisable by him where the taker of the property does not bring eminent domain 
proceedings." Drabek v. City of Norman, 1996 OK 126, ¶ 4, 946 P.2d 658, 659 (citing Black's 
Law Dictionary 825 (6th Ed.1990)). 
¶9 In the present case, Landowners filed an inverse condemnation proceeding 
against GRDA asserting a series of floods resulted in a taking of their private 
properties without just compensation in violation of Oklahoma Constitution, 
Article II, § 24. Article II, § 24 provides, in relevant part:

 
 Private property shall not be taken or damaged for public use without 
 just compensation. Just compensation shall mean the value of the property 
 taken, and in addition, any injury to any part of the property not 
 taken....
Landowners contend the trial court's finding of a taking and the 
determination of the date of taking should not be disturbed on appeal as there 
is competent evidence to support the court's findings.
¶10 GRDA disagrees, contending originally on appeal that: 1) the intermittent 
flowage of water for temporary periods of time on Landowners' properties cannot 
be considered a taking,[6] and 2) the undisputed facts show the Shaws and 
Pryors' properties were flooded and taken by naturally-occurring floods, not 
flooding resulting from the operation of the Dam.[7] At oral arguments held on July 10, 
2013, however, GRDA conceded a taking of Landowners' properties for purposes of 
inverse condemnation had occurred.[8] GRDA asserted that for the Shaws and Pryors, a 
taking occurred in 1986, and for the Perrys, a taking occurred in 1993.[9]
¶11 Article II, Section 24 of the Oklahoma Constitution does not define what 
actions constitute a taking. Case law has found a taking where land is 
physically taken and occupied, where government action substantially interferes 
with the use and enjoyment of property, or where government overtly exercises 
dominion and control over property. Material Serv. Corp., 2012 OK CIV APP 
17, at ¶ 5, 273 P.3d at 883. "The ultimate 
question is whether there is a sufficient interference with the landowner's use 
and enjoyment to constitute a taking by a sovereign." Henthorn v. Oklahoma 
City, 1969 OK 
76, ¶ 10, 453 
P.2d 1013, 1015. The sufficiency of interference is equated to "substantial" 
interference. State ex rel. Dept. of Transp. v. Hoebel, 1979 OK 63, ¶¶ 
9-10, 594 P.2d 
1213, 1215. Moreover, the trier of fact decides the question of substantial 
interference. Henthorn, 1969 OK 76, at ¶ 15, 453 P.2d at 1016; Mattoon v. City of Norman, 1980 OK 137, ¶ 11, 
617 P.2d 1347, 
1349. Conversely, "[a]cts done in the proper exercise of the police power which 
merely impair the use (or value) of property do not constitute a 'taking.'" 
April v. City of Broken Arrow, 1989 OK 70, ¶ 14, 775 P.2d 1347, 
1351.
¶12 With respect to flooding, the Oklahoma Supreme Court has held that 
continual flooding caused by the construction of a public highway, if serious 
enough to constitute substantial interference with the use and enjoyment of the 
property, may constitute a taking. Hoebel, 1979 OK 63, at ¶ 10, 594 P.2d at 1215. The majority rule is that flooding 
may constitute a taking if the flooding is severe enough so as to effectively 
destroy or impair the land's usefulness. Id. at ¶ 8, 594 P.2d 1215 (citing 2 Nichols on Eminent 
Domain, § 6.23(3), and 26 Am.Jur.2d, Eminent Domain, § 65). See also 
Henthorn, 1969 OK 76, 453 P.2d 1013 (Syl. 2)(holding 
frequent aircraft flights over a landowner's property may constitute a taking). 
"Ordinarily, the question of whether a continuing interference is substantial 
enough to constitute a 'taking' under Section 24, Art. 2, Constitution, is one 
for the jury." Id.
¶13 The U.S. Supreme Court recently reiterated requirements for determining 
whether there has been a taking under the Fifth Amendment to the U.S. 
Constitution in Arkansas Game and Fish Comm'n. v. U.S., __ U.S. __, 133 
S.Ct. 511 (2012). The Court noted "[t]he Takings Clause is 'designed to bar 
Government from forcing some people alone to bear public burdens which, in all 
fairness and justice, should be borne by the public as a whole.'" Id. at 
518 (quoting Armstrong v. United States, 364 U.S. 40 (1960)). In 
addition, "[w]hen the government physically takes possession of an interest in 
property for some public purpose, it has a categorical duty to compensate the 
former owner." Id. (quoting Tahoe-Sierra Preserv. Council, Inc. v. 
Tahoe Reg. Planning Agency, 535 U.S. 302 (2002)).
¶14 The issue in Arkansas Game and Fish was "whether government 
actions that cause repeated floodings must be permanent or inevitably recurring 
to constitute a taking of property." Id. at 518. The Court concluded that 
government-induced "recurrent floodings, even if of a finite duration, are not 
categorically exempt from Takings Clause liability." Id. at 515. The 
temporary nature of the flooding did not automatically exclude it from being a 
compensable event under the Takings Clause. While time or duration was the 
relevant factor in determining the existence of a compensable taking, the Court 
held "[a]lso relevant to the takings inquiry is the degree to which the invasion 
is intended or is the foreseeable result of authorized government action." 
Id. at 522. Thus, the duration of a physical invasion is not 
determinative of whether or not the government may be held liable for a taking. 
Regardless of whether the invasion is temporary or permanent, takings liability 
under the Takings Clause can attach to any federal government action that 
constitutes a substantial interference with the use and enjoyment of the 
property. Although not controlling, we find Arkansas Game and Fish 
persuasive.[10]
¶15 The majority rule in this country is that flooding may constitute a 
taking if the flooding is severe enough so as to effectively destroy or impair 
the land's usefulness. See Hoebel, 1979 OK 63, ¶ 8, 594 P.2d at 1215. In the present case, Landowners' 
properties were subject to a series of recurring floods in varying degrees in 
1986, 1993, 1994, and/or 1995. The trial court found the floods were caused by 
the existence and operation of the Pensacola Dam and that the floods constituted 
a sufficient interference with Landowners' use and enjoyment of their properties 
to constitute a taking. Based on our review of the record, we find competent 
evidence from which the trial court, as the trier of fact, could conclude that a 
taking of Landowners' properties has occurred.
1. Date of Taking and Interest Taken 
¶16 The date of taking establishes not only the date of transfer, but also 
the date on which just compensation is to be determined. The date of taking in a 
condemnation case is the date when the condemnor pays the amount of the 
commissioners' award into court. State ex rel. Dept. of Transp. v. Post, 
2005 OK 69, ¶ 
9, 125 P.3d 
1183, 1186-87. Unless a party makes a timely request for a jury trial, the 
commissioners' report establishes compensation. Conversely, in an inverse 
condemnation proceeding, the commissioners' report serves no purpose and just 
compensation, along with whether and the date a taking has occurred, are 
questions of fact for the trier of fact. Id. at ¶ 7, at 1186.[11]
¶17 At oral arguments, GRDA asserted the Shaws and Pryors' date of taking was 
the 1986 flood and the Perrys' date of taking was the 1993 flood.[12] GRDA 
maintains the taking occurred upon the first substantial governmental 
interference with the properties and that any subsequent damage to the 
properties simply constitutes further evidence that the governmental 
interference was indeed substantial. GRDA contends there is only a single, 
permanent taking for each Landowner because the need for the properties has not 
ceased as flooding will inevitably recur again, citing Perkins Whistlestop, 
Inc. v. State ex rel. Dept. of Transp., 1998 OK CIV APP 7, ¶ 7, fn. 4, 954 P.2d 1251, 
1254, (stating there is only one taking). Thus, GRDA maintains: 1) any damages 
before the date of taking are time-barred; 2) any damages after the date of 
taking are barred because the property had previously been taken; and 3) the 
only damages that may be properly awarded are those for the value of the 
property interest taken.
¶18 Landowners disagree, asserting their properties were subject to a series 
of recurring flooding and that the trial court correctly determined the dates 
and interests taken.
¶19 In the present case, the court determined the dates and interests taken 
as follows:

 
 Perrys: April 7, 1994: the beginning date of the flood in the series of 
 floods which reached the highest elevation on their property; a flowage 
 easement
 Pryors: a temporary taking from September 1993 through June 1995
 Shaws: June 2, 1995: the beginning date of the last flood in the series 
 of floods; a fee title
¶20 In an inverse condemnation proceeding involving a series of floods, 
i.e., intermittent and inevitably recurring flooding, as in 
the present case, we conclude the date of taking is not the date the first flood 
substantially interferes with the landowner's use and enjoyment of the property. 
Rather, the date of taking is that date when it becomes clearly apparent that 
the series of flooding is caused by the government or governmental entity having 
the right of eminent domain, is of a permanent nature i.e., although 
intermittent and temporary in duration, is inevitably recurring, and 
substantially or sufficiently interferes with the landowner's use and 
enjoyment of the property.[13] See Henthorn, 1969 OK 76, at ¶ 10, 453 P.2d at 1015. The determination of these questions 
by the trier of fact will not be disturbed on appeal if supported by competent 
evidence.
¶21 With respect to the interest taken, GRDA initially asserted the proper 
remedy was a flowage easement. A flowage easement is the right to overflow the 
land of another in the accumulation and maintenance of an artificial body of 
water. 78 Am. Jur. 2d Waters § 261 (2011). In its supplement briefing after oral 
argument, however, GRDA asserted granting a flowage easement may be unrealistic 
and that the transfer of a fee simple interest may be the only rational remedy 
in this case.
¶22 The determination of the appropriate interest taken is a question of fact 
for the trier of fact. If Landowners are capable of making valuable uses of 
their property despite the recurring flooding, a flowage easement may be the 
appropriate interest taken. However, if the trier of fact determines a 
Landowner's property is no longer useful for any purpose, GRDA's actions may 
constitute a complete taking. This is a question of fact for the trier of 
fact.
¶23 Accordingly, we reverse and remand to the trial court for a 
redetermination of the dates of taking and interests taken, either a flowage 
easement or fee simple interest, in accordance with this opinion. The 
determination of these issues is a prerequisite to the determination of an award 
of just compensation. However, the Court notes that pursuant to Art. II, § 24 of 
the Oklahoma Constitution, Landowners are entitled to recover just compensation 
for all property taken or damaged for public use whether the damages are direct 
or consequential. "[T]he required payment for 'just compensation' is not limited 
to property 'taken,' but extends also to property 'damaged.'" Williams, 
2000 OK CIV APP 
19, at ¶ 14, 998 P.2d at 1249. "The essential 
consideration in determining compensation for a taking of a property interest is 
to put the property owner in as good a position as it would be if no taking had 
occurred." Material Serv. Corp., 2012 OK CIV APP 17, at ¶ 13, 273 P.3d at 887.[14]
B. Statute of Limitations
¶24 Landowners counter-appeal, asserting the trial court erroneously applied 
the two-year statute of limitations in 12 O.S.2011, § 95(A)(3) to their personal 
property losses. Landowners contend the fifteen-year inverse condemnation 
limitation period applies to all property taken, asserting personal property 
taken by flooding is an element of the total value of a landowner's award of 
just compensation. Landowners maintain that subjecting real and personal 
property to differing statute of limitations is arbitrary and inconsistent with 
the underlying policy of Article II, § 24 of the Oklahoma Constitution and fails 
to make the landowner "whole" and, in reality, collapses the entire action to a 
two-year statute of limitation whenever personal property is taken. Finally, 
Landowners assert that rules of statutory construction require rejection of the 
two-year provision, noting § 95 sets forth the limitations periods to bring 
"[c]ivil actions other than for the recovery of real property" and generally 
pertains to a list of tort actions.
¶25 GRDA disagrees, asserting Oklahoma statutes clearly provide that a 
fifteen-year limitations period applies to "an action for the recovery of real 
property . " and a two-year limitation period for damages to personal property, 
citing 12 O.S.2011, § 95(3). GRDA asserts that personal property is not "taken," 
i.e., the government does not take title to the property as it does with 
real property, but is merely damaged or injured, citing State ex rel Dept. of 
Transp. v. Little, 2004 OK 74, ¶ 19, 100 P.3d 707, 717 
("A condemnee is entitled to compensation for 'damages to personal property 
incident and necessarily caused by the exercise of the power of eminent domain 
in taking land.'") Thus, GRDA contends the statute of limitations for personal 
property is properly two years.
¶26 Article 2, § 24 of the Oklahoma Constitution does not contain a 
limitations period, nor does it distinguish between real and personal property, 
but extends just compensation to all private property taken or damaged.[15] In 
Drabek v. City of Norman, 1996 OK 126, at ¶ 4, 946 P.2d at 660, the Oklahoma Supreme Court noted that 
"[n]either statute nor constitution establishes a limitation period for bringing 
a suit in inverse condemnation. Case law has determined limitations periods 
based on whether there has been a taking." The Court subsequently held the 
fifteen-year prescriptive period was appropriate where there was a taking of 
real property without just compensation. Id., 1996 OK 126, at ¶ 5 & 16, 946 P.2d at 660 & 61-62 ("Early case law 
established the fifteen-year period governing adverse possession to be the 
appropriate limitation period in an inverse condemnation proceeding where there 
was a taking of plaintiff's property for public use without compensation.") The 
applicable limitation period for personal property in an inverse condemnation 
action has not been addressed in Oklahoma.
¶27 Condemnation proceedings, including inverse condemnation, do not involve 
a tort and are not, strictly speaking, civil actions or suits. Inverse 
condemnation is a special statutory proceeding for the purpose of ascertaining 
just compensation. Drabek, 1996 OK 126, at ¶ 8, 946 P.2d at 660; Oklahoma City v. Wells, 1939 OK 62, 91 P.2d 1077. In an 
inverse condemnation proceeding, the claim for "just compensation" includes all 
taken or damaged property, whether real and personal. The proceeding is designed 
to determine in a single action all compensation for property taken from private 
persons for public use.
¶28 If the Court applies the two-year limitation period as GRDA asserts, 
widely divergent limitations' periods to recover just compensation for the same 
governmental action in the same inverse condemnation proceeding would be 
applicable. "The underlying purpose of statutes of limitations is to prevent the 
unexpected effort at enforcement of stale claims concerning which persons 
interested have been thrown off their guard by want of prosecution for a long 
time." Wing v. Lorton, 2011 OK 42, ¶ 11, 261 P.3d 1122, 
1125 (citing Seitz v. Jones, 1961 OK 283, ¶ 11, 370 P.2d 300, 302). 
It is designed to end stale claims and compel parties to diligently pursue their 
claim before relevant facts are obscured through the passage of time. 
Id.
¶29 In the present case, a party could be deprived of a component of just 
compensation, i.e., personal property damages, through application of 
multiple statutes of limitations even though recovery of just compensation for 
real property and associated damages remains viable. Article II, § 24 of the 
Oklahoma Constitution provides that "Private property shall not be taken or 
damaged for public use without just compensation. . " "The term 'property' as 
used in our Constitution regarding the taking of private property for public use 
for which just compensation must be paid includes not only real estate held in 
fee, but also easements, personal property and every valuable interest which can 
be enjoyed and recognized as property." Little, 2004 OK 74, at ¶ 22, 100 P.3d at 718.

 
 This court should never be unmindful that a landowner is entitled to be 
 compensated fully when the latter's property is taken by the government in 
 the exercise of the eminent domain power. The mandate of both the state and 
 federal constitutions strongly supports full indemnification by just 
 compensation. The command requires that the condemnee be placed as fully as 
 possible in the same position as that occupied before the government's 
 taking.
Id. at ¶ 23, 100 P.3d at 718 (citing 
Oklahoma Turnpike Auth. v. New Life Pentecostal Church of Jenks, 1994 OK 9, ¶ 12, 870 P.2d 762, 766). 
Furthermore, a limitations period should not become an instrument of injustice. 
See 54 C.J.S. Limitations of Actions § 2 (2013).[16]
¶30 Accordingly, we decline to impose such a result and find the appropriate 
statute of limitations period applies to the claim and not to the individual 
components of relief in an inverse condemnation proceeding. Thus, we hold the 
appropriate limitations period is fifteen years for an inverse condemnation 
proceeding for the taking or damaging of all private property, including real 
and personal. This result avoids divergent limitations periods for components of 
a single claim and does not require the owner to resort either to piecemeal or 
premature litigation to ascertain just compensation. Thus, the trial court erred 
in applying the two-year statute of limitations to Landowners' personal property 
claims, and this portion of the trial court's order is reversed.

¶31 REVERSED AND REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS 
OPINION.

THORNBRUGH, P.J., concurs and and RAPP, J., concurs in part and dissents in 
part.

FOOTNOTES

[1] By 
order dated August 15, 2011, the Oklahoma Supreme Court ordered Appeal Nos. 
109,714, 109,715, and 109,716 consolidated under surviving Appeal No. 109,714. 
In addition, this Court declines to strike the amended designation of 
record.

[2] A 
flowage easement permits GRDA to flood privately-owned property, if necessary, 
for the operation of the project.

[3] Pryors' 
property also sustained flooding in 1986, although they were not the owners of 
the property. Apparently, the previous owner abandoned the property after the 
1986 flood.

[4] Perrys, 
Pryors, and Shaws' claims were severed for procedural reasons and are the only 
landowners involved in the current appeal.

[5] Dr. 
Robert A. Mussetter was another expert in the Dalrymple case.

[6] GRDA 
asserted no taking occurred because Landowners restored and returned to their 
homes and continued to live on the property. Thus, the properties usefulness was 
not destroyed or seriously or substantially impaired to the point Landowners 
could not exercise dominion and control.

[7] For 
example, GRDA asserted a taking of the Shaws' property did not occur because the 
property was flooded by four feet of water in 1986 and 50% of this was due to 
naturally-occurring flooding. Thus, the additional flooding caused by GRDA's 
operation of the dam affected a house already flooded and "taken" by 
naturally-occurring flooding.

[8] This 
Court granted GRDA's motion for oral arguments by order dated June 3, 
2013.

[9] GRDA's 
concession, rejected by Landowners, is only a statement against interest. Its 
concession cannot usurp the functions of the court to decide questions of law 
and the trier of fact to decide issues of fact. In inverse condemnation 
proceedings, whether there is a sufficient interference with the landowner's use 
and enjoyment to constitute a taking, and the date of taking, is a question of 
fact for the trier of fact. See Henthorn v. Oklahoma City, 1969 OK 76, 453 P.2d 
1013.

[10] The 
parties dispute the applicability of Arkansas Game and Fish to the 
present case. GRDA asserts it is inapplicable because a permanent condition 
exists in the present case that will inevitably recur. Landowners disagree, 
asserting the case supports its positions of multiple temporary takings. GRDA 
further asserts the federal and state takings clauses are distinct as held in 
Board of Cty. Comm'rs of Muskogee Cty v. Lowery, 2006 OK 31, 136 P.3d 639. In Lowery, the 
Oklahoma Supreme Court held the Oklahoma Constitution provides private property 
protection to Oklahoma citizens beyond that which is afforded them by the Fifth 
Amendment to the U.S. Constitution. Thus, Oklahoma's constitutional eminent 
domain provisions place more stringent limitations on governmental eminent 
domain power than the limitations imposed by the Fifth Amendment to the U.S. 
Constitution. Lowery did not hold as GRDA asserts.

[11]In 
an inverse condemnation proceeding, issues regarding whether a taking has 
occurred, the date of taking, and the measure of damages are all questions of 
fact for the trier of fact. See e.g., State ex rel. Dept. of Transp. 
v. Post, 2005 
OK 69, 125 P.3d 
1183 (In an inverse condemnation proceeding, the commissioners' 
report is irrelevant and does not decide the issue of a taking); Williams v. 
State ex rel. Dept. of Transp., 2000 OK CIV APP 19, ¶ 13, 998 P.2d 1245 
(determination of a taking must be made by the trier of fact). Conversely, 
regular condemnation proceedings are governed by legislatively-prescribed 
procedures which are ordinarily designed to resolve only the issue of just 
compensation. These procedures are not designed to deal with the issue of 
whether there has been a taking since an actual taking must occur before the 
process can begin. Thus, condemnation procedures, including the appointment of 
commissioners, are not followed in inverse condemnation proceedings.

[12] 
Again, it is axiomatic that only persons with a valid property interest at the 
time of the taking are entitled to compensation. Almota Farmers Elevator 
& Warehouse Co. v. United States, 409 U.S. 470, 473-74.

[13] 
This rule should not be read to exclude a temporary flood invasion from takings 
liability. This rule only applies to those situations involving intermittent and 
inevitably recurring flooding.

[14] In 
the present case, GRDA chose not to condemn Landowners' properties despite 
recurrent flooding. Following each flood, Landowners restored and repaired their 
properties, not knowing that their properties would be subject to recurring 
flooding caused by operation of the Pensacola Dam. Landowners were required to 
file for inverse condemnation and are entitled to be fully compensated under the 
law as a result of the taking. See also fn. 18, infra.

[15] A 
plaintiff may recover for personal property in an inverse condemnation case. The 
wording of Art II, § 24 of the Oklahoma Constitution does not distinguish the 
type of property covered in the Article. State ex rel. Dept. of Transp. v. 
Little, 2004 OK 
74, 100 P.3d 
707; Blincoe v. Choctaw Oklahoma & Western R.R. Co., 1905 OK 120, 83 P. 903; see 
Broward County v. Rhodes, 624 So.2d 319 (Fla. Dist. Ct. App. 1993) 
(recognizing that personal property may be the subject of inverse condemnation); 
Hawkins v. City of La Grande, 843 P.2d 400 
(Or. 1992). This Court notes the case of Pete v. U. S., 569 F.2d 565 (Cl. Ct. 1978), where the 
plaintiffs were held to be entitled to recover litigation expenses in a 
successful inverse condemnation action for the taking by a federal agency of 
their personal property. In State ex rel. Dept of Transp., 2004 OK 74, at ¶ 
22, 100 P.3d at 718, the Court stated:
[Art II, § 24] is not by its terms limited to real property nor does it 
exclude from compensable injury damage to personal property when an entire tract 
of land is taken. "The term 'property' as used in our Constitution regarding the 
taking of private property for public use for which just compensation must be 
paid includes not only real estate held in fee, but also easements, personal 
property and every valuable interest which can be enjoyed and recognized as 
property.".

[16]The 
federal court applies the stabilization doctrine in flooding cases. In United 
States v. Dickinson, 331 U.S. 745, 749 (1947), the U.S. Supreme Court held 
"[w]hen a taking is caused by a continuous process, it is not complete, for 
purposes of determining when the claim arose, 'until the situation becomes 
stabilized.'" In Dickinson, the government took property through a 
"continuing process of physical events." The landowners filed an inverse 
condemnation proceeding alleging the flooding was a taking. The Court ruled that 
under such circumstances, because the government had put the "onus of 
determining the decisive moment in the process of acquisition by the United 
States" on the landowner, the landowner was permitted to postpone filing suit 
"until the situation [became] stabilized." Id. at 748-49. "The Fifth 
Amendment expresses a principle of fairness and not a technical rule of 
procedure enshrining old or new niceties regarding 'causes of action'--when they 
are born, whether they proliferate, and when they die." Id. at 748. Thus, 
Dickinson warned against applying an excessively rigid rule when the 
government takes property through a gradual physical process. Id. at 749. 
"[W]hen the Government chooses not to condemn land but to bring about a taking 
by a continuing process of physical events, the owner is not required to resort 
either to piecemeal or to premature litigation to ascertain the just 
compensation for what is really 'taken.'" Id. Although not controlling in 
Oklahoma, we find the stabilization doctrine persuasive in determining the 
applicable statute of limitations in the present case.




RAPP, J., concurring in part and dissenting in part:
¶1 While I agree that all of the Grand River Dam Authority's (GRDA) appeal 
must be reversed, I dissent from the resolution of these appeals by the 
Majority.
¶2 I concur with the Majority's Decision that the fifteen-year Statute of 
Limitations applies to each of the individual landowner's claims for just 
compensation for taking of personal property. However, because there are issues 
about the taking and dates of taking, I would have the trial court apply the 
fifteen-year limitation only after the takings issues are resolved.
I.GRDA Appeals.
¶3 My point of departure from the Majority begins with its direction to the 
trial court to re-determine the dates of takings and interests taken, either of 
a flowage easement or fee simple interest. The Majority's directive to the trial 
court does not comport with the facts of the case as to each individual 
landowner and omits consideration of a temporary taking along with the separate 
measure of damages where the taking is temporary.
¶4 Although each landowner suffered from flooding caused by GRDA, there are 
material facts unique to each case. Thus, a review of the facts and the trial 
court's dispositions are in order.
¶5 Flooding occurred in 1986, September 1993, April 1994 and June 1995. The 
1986 flood affected the Shaws' property. The trial court's finding that about 
one-half of the flood water depth in 1986 was due to GRDA has not been disputed 
in this appeal. The 1986 flood also affected the Pryors' property, but Pryors 
did not own the property at that time, having purchased it in 1989 with 
knowledge of the 1986 flood. Each flood in 1993, 1994 and 1995, above a 
pre-existing flowage easement, was caused by GRDA for all of the properties.
A. Perrys' Property Facts.
¶6 Perrys' property was flooded in September 1993, along with the crawl space 
of the residence. The residence and property were subject to flooding in April 
1994, and June 1995. On each occasion, the Perrys' cleaned and restored their 
residence and moved back into it. The trial court itemized a list of damages on 
each occasion including value of time and the costs of cleaning and restoring. 
The Perrys were deprived of the use and enjoyment of the home on each flood 
event ranging from forty hours in 1993 and 1995 to three months in 1994. The 
April 1994 flood was the flood that reached the highest elevation and the court 
ruled that this flood constituted a taking of the flowage easement on Perrys' 
property and established the date of taking as April 7, 1994. Damages were 
awarded for clean-up time and costs as to all floods and for the easement.
B. Pryors' Property Facts.
¶7 Pryors' property was subject to flooding in September 1993, but not the 
residence. The floods of April 1994, and June 1995, also affected the residence. 
The property also flooded in 1986 to a depth of five feet, with three and 
one-half feet of that flood due to natural causes and the balance the GRDA Dam 
operation. The owners in 1986 abandoned the property and Pryors acquired the 
property in 1989, after being informed of the 1986 flood history.
¶8 On each occasion during their ownership, the Pryors' cleaned and restored 
their property and moved back into the residence. The 1993 flood did not enter 
their home. The 1994 flood resulted in two feet of water in the home. The 1995 
flood had water in the duct work under the house. The trial court itemized a 
list of damages on each occasion including value of time and the costs of 
cleaning and restoring.
¶9 The Pryors were deprived of the use and enjoyment of the home for six 
months after the 1994 flood. On the occasions of the 1993 and 1995 floods, they 
spent a number of hours in cleaning and restoration. The trial court found that 
this series of floods "significantly impacted and interfered with" Pryors' use 
and enjoyment of their property. However, they continued to live there until 
2005, when they sold the property. No flowage easement was taken, but the trial 
court awarded damages for clean-up time and costs and diminished value of the 
property.
C. Shaws' Property Facts.
¶10 Shaws' property was subject to flooding in September 1993, April 1994, 
and June 1995. The property and residence was also the subject of flooding in 
October 1986 to a depth of four feet, of which about one-half of the depth of 
the flood water was due to natural causes and the balance due to the GRDA Dam 
operation.
¶11 On each occasion until 1995, the Shaws' cleaned and restored their 
property and moved back into the residence. After the 1995 flood, Shaws 
abandoned the property due to the series of floods from 1986 to 1995, but 
retained title to the property.
¶12 Damages were incurred for cleaning and restoring the property after the 
floods, until 1995. The trial court itemized these damages and awarded Shaws 
damages for clean-up time and costs attributed to the 1986, 1993, and 1994 
floods. The trial court prorated the 1986 damages based upon natural cause.
¶13 The fair market value of Shaws' property before the 1993 flood was 
$54,600.00 and the value of the real property was $500.00 after the 1995 
flood. Approximately, one-half of the property was subject to the existing 
flowage easement, but the home was on the one-half above the flowage 
easement.
¶14 The sum of $54,600.00 was awarded for the diminished value of their 
property caused by the series of floods from 1993 to 1995. The trial court 
established June 2, 1995, as the date of taking and that the fee was taken, so 
GRDA was awarded the fee title as of that taking date.
II. Analysis of the Taking Claims.
¶15 "Inverse condemnation" is not a means of property acquisition but, 
rather, is the landowner's remedy for uncompensated takings of property for 
public use. The Majority correctly observes that whether a taking has occurred 
and the date of the taking present questions of fact in inverse condemnation 
cases.[1]
¶16 Moreover, a taking may result from a series of actions, either continual 
or continuous in nature. Arkansas Game and Fish Comm'n v. U.S., __ U.S. 
__, 133 S. Ct. 511 (2012); State ex rel. Dep't. of Transp. v. Hoebel, 1979 OK 63, 594 P.2d 1213; 
Henthorn v. Oklahoma City, 1969 OK 76, 453 P.2d 1013. 
¶17 In addition, a taking may be permanent or temporary. Material Service 
Corp .v. Rogers County Bd. of Comm'rs, 2012 OK CIV APP 17 , ¶ 9, 273 P.3d 880, 885. 
The measure of compensation is not the same for a permanent taking as for a 
temporary taking.
¶18 A permanent "taking" of property, or an interest in property, consummates 
a transfer of the property, or an interest in property, to the taker on the date 
of taking. The date of taking establishes not only the date of transfer, but 
also the date on which the value of the transfer is to be calculated. This rule 
is self-evident in cases of a single action resulting in a taking. This rule 
provides for full compensation to an inverse condemnation claimant. Also, the 
rule establishes a reasonable and efficient criterion in cases of ongoing or 
repeated action. Thus, damages can be made certain and bear a reasonable 
relationship to the responsibility of the taker to pay compensation.
¶19 In the case of a temporary taking, the cases reflect different approaches 
to achieve the just compensation result. One method is to determine the rental 
value of the property for the period it was taken plus any actual damage 
sustained as a result of that taking. Another method would compensate based upon 
the loss of the economic use of the property. "It has been said that, in cases 
involving a temporary taking, the best approach is a flexible approach that will 
compensate for losses actually suffered while avoiding the threat of windfalls 
to plaintiffs at the expense of substantial government liability." Material 
Service Corp., 2012 OK CIV APP 17 at ¶ 10 n.5, 
273 P.3d at 886 n.5.
¶20 Restoration costs may be awarded in temporary taking cases instead of 
diminution in value. Fowler Irrevocable Trust 1992-1 v. City of 
Boulder, 17 P.3d 797, 805-06 (Colo. 2001); Sunburst Sch. Dist. No. 2 v. 
Texaco, 2007 MT 183, ¶ 38, 165 P.3d 1079, 
1087-88 (Mont. 2007) (pointing out that a residence is the type of property that 
the owner would wish to repair).
¶21 I would hold that, in cases of a temporary taking of real property, the 
measure of compensation is the rental value for the temporary period of the 
taking plus any actual damages and restoration costs. In cases of a permanent 
taking of any type of property, the measure of compensation is the fair market 
value of the property interest taken on the date of taking, plus any actual 
damages and restoration costs.
III. Application to Each Landowner.
A. Perrys' Property.
¶22 The trial court's damage determinations for each of the three flood 
years, 1993-1995, included: (1) restoration costs, including personal time; (2) 
losses related to personal property; and (3) accumulated diminution of value of 
the real property over repairs and restoration, with that sum apparently being 
awarded for the flowage easement granted to GRDA. However, there was a single 
taking of a flowage easement only in 1994.
¶23 The trial court found that the taking by GRDA amounted to a flowage 
easement, with the date of taking of April 7, 1994. There is a fact-dependent 
point at which a substantial interference with the landowner's use and 
enjoyment of the property constitutes a taking. Here, in Perrys' case, the trial 
court made a single finding of a taking. Given a single taking, the trial court 
erred in assessing damages over a three-year period.
¶24 In a single taking case, with a taking date in April 1994, the damages 
for personal property losses, restoration and cleaning incurred prior to or 
after that date of taking do not represent just compensation for the taking in 
April 1994. It is true, under the facts here, that the Perrys sustained losses 
in 1993 and 1995 and that GRDA is responsible for those losses. However, in a 
single taking case, the claims for the 1993 and 1995 losses are not supported by 
a taking theory and would then be ordinary damage claims.[2]
¶25 However, the trial court also made findings that the 1993 and 1995 floods 
constituted interference with the Perrys' use and enjoyment of their property. 
This finding is a predicate to the ultimate conclusion that a taking, temporary 
or permanent, has also occurred in those two years. Nevertheless, the trial 
court did not specifically find either a permanent or temporary taking 
attributed to these two floods.
¶26 Therefore, I would rule that the trial court must specifically determine 
from the evidence whether the 1993 and 1995 floods also constituted takings, and 
if so to define the nature of the takings of the Perrys' real property as 
temporary or permanent. The existence of these takings is a necessary 
requisite to an award of compensation for these events and the method of 
calculation of compensation.[3]
¶27 In the event the trial court determines that a taking occurred as a 
result of any of these other floods, then I would have the trial court determine 
whether any personal property was also taken and award compensation, if any, for 
the personal property taken. If the trial court finds that there was not a 
taking, then the acknowledged losses do not become losses to be compensated in 
an inverse condemnation proceeding.
¶28 All compensation for any taking must be calculated as of the date of 
taking. At first, it would appear that recovery of compensation associated with 
restoration after the 1994 flood is inconsistent with recovery of compensation 
associated with diminution of value as a result of the flowage easement. 
However, the facts show that Perrys returned to the residence after the 1994 
flood that resulted in the taking of the flowage easement, thereby not 
foreclosing any cleaning and restoration costs.
¶29 The trial court incorrectly aggregated all three flood years to determine 
the diminution in value of Perrys' real property. The measure of damages in the 
Perrys' case for the taking of a flowage easement is the diminution of the 
market value of their property, with the valuation date being the date of 
taking, April 7, 1994. Moreover, it is necessary to consider the effect of any 
determination of a permanent taking in 1993. Thus, I would also reverse the 
judgment for Perrys for compensation for the flowage easement on this 
ground.
¶30 Personal property taken is subject to compensation and the claim 
therefore is not time barred. Nevertheless, there must be a determination that 
the personal property was taken and a date of taking. The trial court's judgment 
denying recovery for personal property compensation must be reversed and this 
aspect of the case is remanded for the required takings determinations.
B. The Pryors' Property.
¶31 The trial court found that the Pryors sustained temporary takings as to 
each of the floods in 1993, 1994 and 1995.[4] The judgment does not specifically 
find a date, or dates, of taking.
¶32 The trial court's separation of compensation for the restoration and 
clean-up suggests three takings dates, one for each flood year. However, the 
aggregation of the three years for purposes of calculating diminished value, 
suggests that the last flood year culminated in a permanent taking. 
Nevertheless, the Pryors' journal entry is that the trial court made a finding 
of a temporary taking.
¶33 Thus, the judgment is internally inconsistent and its findings do not 
resolve the issue of compensation. The trial court's assessment of both 
restoration and diminution of value damages was inconsistent in light of the 
conclusions that: (1) restoration costs were incurred to restore the property to 
its condition prior to each flood; and (2) takings in each case were 
temporary.
¶34 Ordinarily, "restoration" and "diminution of value" are mutually 
inconsistent as measures of damages.[5] Property that is "restored" would not lose its 
pre-restoration value. On the other hand, property that is not, or cannot be, 
fully restored would diminish in value and, to that extent, the entity using the 
property has taken a property interest. Here, the Pryors' judgment is 
inconsistent as drafted because it finds both a restoration to original 
condition and a diminution of value.
¶35 However, the trial court's award of damages for restoration associated 
costs for the 1993, 1994 and 1995 floods amounted to sums "to restore the 
property to its condition immediately before the flood." [6] This conclusion is not 
consistent with a partial restoration case where both restoration costs and 
diminution of value could be considered to make the property owner whole for a 
permanent taking.
¶36 Next, the trial court used the measure of compensation applicable to a 
permanent taking. As shown above, the measure of compensation for temporary 
takings is the rental value for the temporary period taken plus any actual 
damages and restoration costs. Therefore, I would reverse the judgment for fair 
market value and remand for redetermination of compensation for the temporary 
taking of the Pryors' real property. The denial of their claim for personal 
property compensation would also be reversed to determine whether personal 
property was taken on the date, or dates, of takings as found by the trial court 
and to award just compensation for such takings, if any.
¶37 Therefore, I would reverse the trial court's judgment as to the amount of 
compensation awarded to the Pryors for restoration and associated costs and for 
diminution of value and remand to decide the date, or dates, on which a 
temporary taking occurred and to award compensation for the temporary 
taking.
C. The Shaws' Property.
¶38 The trial court awarded the Shaws cleaning and restoration damages due to 
the 1993 and 1994 floods. The trial court awarded a prorated sum for the 1986 
flood based upon the finding that one-half of that flooding of their property 
was naturally caused. In each instance, the trial court found that the Shaws 
expended the sums to restore their property to its original condition.
¶39 Shaws abandoned their property after the 1995 flood. The trial court 
established the June 2, 1995, flood date as the date of taking and determined 
that the extent of the taking was the entire fee interest as of that date. The 
trial court's selection of this date as the taking date, rather than one of the 
other three flood dates, and the extent of the taking, is inconsistent with an 
award of compensation for the other flood events absent a finding of a taking, 
temporary or permanent, on those prior occasions.
¶40 The trial court did not use a market value immediately before the 1995 
flood as the beginning value for the Shaws' real property. However, GRDA 
specifically does not contest the calculation of damages. Therefore, GRDA waived 
any error in the selection of a beginning valuation date. Therefore, I would not 
disturb the finding of $54,200.00, as the value of the real property before the 
onset of the 1995 flood.
¶41 The selection of the 1995 flood date as the taking date results in 
similar legal issues as those in the other two cases.[7] Thus, absent a date of taking 
corresponding to the earlier floods in 1986, 1993 and 1994, the damages 
associated with these events become claims not based upon inverse condemnation. 
As a result, GRDA is responsible for the damages for restoration associated 
costs and personal property losses, but the Shaws' claim for these pre-1995 
events would be time-barred if there were no earlier takings.
¶42 This Court should require that the trial court must specifically 
determine whether the 1986, 1993 and 1994 floods also constituted separate 
takings of Shaws' property, and, if so, to define the nature of the takings and 
fix just compensation, if any, in accord with those findings. The existence of 
those takings is a necessary requisite to an award of just compensation for 
these events. After making these findings and awarding any compensation, the 
trial court should then be directed to adjust the fee taking, if appropriate, to 
account for prior permanent takings of the real property. In the event the trial 
court determines that a taking occurred as a result of any of these earlier 
floods, then the court should further be directed to determine whether any 
personal property was also taken and award compensation, if any, for the 
personal property taken.
D. Statute of Limitations.
¶43 The Majority correctly rules that the appropriate limitation period is 
fifteen years for the inverse condemnation claim for taking personal property. 
This result is consistent with the case authority where the claim involved only 
real property and is consistent with the "transactional approach" in civil 
actions. The result avoids having divergent limitations periods for components 
of a single claim. However, I would further rule that whether the plaintiffs may 
avail themselves of the fifteen-year period in this instance depends upon 
whether a taking has occurred, and whether a taking occurred is also an issue 
for the real property parts of the case.
IV. Summary
¶44 When, as here, a government entity damages real or personal property by 
its actions, the injured party might seek compensation either under a theory 
from ordinary civil litigation, or under a special proceeding, termed inverse 
condemnation. The injured party must establish the fact of taking in order to 
recover.
¶45 The taking occurs when the governmental action has resulted in the 
substantial interference with the use and enjoyment of the injured party's 
property. The fact of taking may be permanent or temporary and may include 
personal property. In inverse condemnation cases, whether there is a substantial 
interference with the use and enjoyment of property, the extent of the taking 
and the compensation for the taking are questions for the trier of fact.
¶46 A taking might result from a series of acts, here a series of floods. In 
such cases, the trier of fact determines the date (or dates if more than one 
taking is found) on which the substantial interference occurred. However, the 
trial court must determine: (1) whether the taking is permanent or temporary, 
and, if permanent the extent thereof; and (2) a date, or dates, of taking. Then, 
when a decision is reached that a taking has in fact occurred and its scope, 
together with the date of taking, the trier of fact can proceed to the question 
of just compensation.
¶47 In the cases under review, the trial court made findings consistent with 
takings on each flood event. However, as to the Landowners Shaws and Perrys, the 
trial court also fixed only single date of taking. Nevertheless, the trial court 
awarded compensations covering the entire series of floods affecting these 
Landowners. The trial court erred and must find also that a taking occurred on 
each occasion in order to provide an inverse condemnation basis for an award of 
compensation as to each occasion.
¶48 The trial court's judgment contains inconsistent measures of compensation 
for the Shaws and the Perrys. Recovery for total restoration and diminution of 
value of the same property are mutually inconsistent. Here, the trial court's 
judgment and findings reached inconsistent results by awarding both types of 
recovery. In an appropriate set of facts and findings, an injured party might be 
entitled to recover restoration associated costs and diminution of value when 
the restoration was not to original condition after the taking. However, the 
trial court must make findings consistent with both types of compensation, which 
it did not do here.
¶49 In the case of the Landowner Pryors, the trial court found temporary 
takings, but did not define the extent of the takings or any dates of taking. 
Nevertheless, the trial court awarded the Pryors diminution of value and 
restoration to original condition costs. Here also the trial court must 
establish takings, dates of taking, and compensations appropriate to the nature 
and extent of the taking. In addition, the trial court must determine whether 
the 1986 flood constituted a taking, and if so, the nature of the taking and 
account for that it in its consideration of the 1993, 1994 and 1995 floods.


FOOTNOTES

[1]At oral 
argument, GRDA conceded that a taking occurred, but did not concede the dates as 
found by the trial court.

[2]I do not 
agree with GRDA's position that the award o+f a 1994 flowage easement precluded 
damages occurring within the easement in 1995. Perrys had not been paid for the 
easement in 1995 and it did not then exist by virtue of a court decree. It would 
be unfair to impose a constructive notice of the easement on them. 


[3]The 
final determination may affect the compensation calculation for a subsequent 
event, and the trial court can make such adjustment as the case 
warrants.

[4] Thus, 
they had no interest in 1986 subject to a taking and compensation. The trial 
court did not account for whether the 1986 flood also amounted to a taking, and, 
if so, the extent of the 1986 taking. GRDA would have the taking occur in 1986, 
apparently to deprive Pryors of some or all of the compensation. However, this 
position was taken for the first time on appeal.
It is noted that the trial court did award compensation to the Shaws for the 
1986 flooding. Initially, this would appear to be an inconsistent outcome, 
resulting in a windfall recovery to the Pryors for failure to account for a 
taking prior to their ownership of the property.
However, I would conclude otherwise. First, assuming a permanent taking in 
1986, GRDA had not paid compensation for the taking and it would be unfair to 
charge the Pryors with constructive notice of an undefined, uncompensated taking 
even though they were aware of the 1986 flooding.
Second, all of the takings in Pryors' case are temporary. Unless GRDA were 
awarded a fee taking retroactively, the temporary taking would still be 
supported by the evidence and a reduction of compensation would result in a 
windfall for GRDA.

[5]The 
market value approach is the usual means of measuring damages, but not always. 
See Fowler Irrevocable Trust 1992-1, 17 P.3d at 
803; City of Tulsa v. Mingo Sch. Dist. No. 16, 1976 OK CIV APP 27, 559 P.2d 487 (in a 
partial taking case, the restoration costs are appropriate measure of damages 
where property has special use).
The case of State v. Levick, 1961 OK 215, 365 P.2d 141, is distinguished. The 
Court held that the before and after market value was the correct measure of 
damages where the State sought a temporary right to remove sand and gravel. 
There, unlike here, the State physically removed, took possession and used 
materials from the owner's property.

[6]A total 
restoration would authorize consideration of damages measured by rental value or 
costs of alternative living arrangements during the restoration period. See 
Gledhill v. State, 243 N.W. 909 (Neb. 1932) (the damages for property taken 
temporarily is not the market value, but the value of the use for the period 
damaged). 

[7]However, 
the trial court made no award for personal property losses from the 1995 flood 
and there were no restoration associated costs for that flood. 






 Citationizer© Summary of Documents Citing This Document
 
 
 Cite
 Name
 Level
 
 
 None Found.
 
 
 Citationizer: Table of Authority
 
 
 Cite
 Name
 Level
 
 
 Oklahoma Court of Civil Appeals Cases
 Cite
Name
Level

 1998 OK CIV APP 7, 954 P.2d 1251, 9 OBJ 517, PERKINS WHISTLESTOP, INC. v. STATE ex rel. DEPT. OF TRANSPORTATION
Discussed
 2012 OK CIV APP 17, 273 P.3d 880, MATERIAL SERVICE CORPORATION v. ROGERS COUNTY BOARD OF COMMISSIONERS
Discussed at Length
 1976 OK CIV APP 27, 559 P.2d 487, CITY OF TULSA v. MINGO SCH. DIST. NO. 16
Discussed
 2000 OK CIV APP 19, 998 P.2d 1245, 71 OBJ 1208, WILLIAMS v. STATE ex rel. DEPT. OF TRANSPORTATION
Discussed at Length
Oklahoma Supreme Court Cases
 Cite
Name
Level

 1989 OK 70, 775 P.2d 1347, 60 OBJ 1133, April v. City of Broken Arrow
Discussed
 1939 OK 40, 87 P.2d 127, 184 Okla. 306, HARN v. STATE ex rel. WILLIAMSON
Discussed
 1939 OK 62, 91 P.2d 1077, 185 Okla. 369, OKLAHOMA CITY v. WELLS
Discussed
 1994 OK 9, 870 P.2d 762, 65 OBJ 283, Oklahoma Turnpike Authority v. New Life Pentecostal Church of Jenks
Discussed
 1961 OK 215, 365 P.2d 141, STATE v. LEVICK
Discussed
 2002 OK 2, 47 P.3d 467, 73 OBJ 359, CITY OF TAHLEQUAH v. LAKE REGION ELECTRIC, CO-OP, INC.
Discussed
 1969 OK 76, 453 P.2d 1013, HENTHORN v. OKLAHOMA CITY
Discussed at Length
 2004 OK 74, 100 P.3d 707, STATE ex rel. DEPT OF TRANSPORTATION v. LITTLE
Discussed at Length
 2005 OK 69, 125 P.3d 1183, STATE ex rel. DEPT. OF TRANSPORTATION v. POST
Discussed at Length
 2006 OK 31, 136 P.3d 639, BOARD OF COUNTY COMMISSIONERS OF MUSKOGEE COUNTY v. LOWERY
Discussed
 1996 OK 126, 946 P.2d 658, 67 OBJ 3630, Drabek v. City of Norman
Discussed at Length
 2011 OK 42, 261 P.3d 1122, HAWK WING v. LORTON
Discussed
 1979 OK 63, 594 P.2d 1213, STATE EX REL. DEPT. OF TRANSP. v. HOEBEL
Discussed at Length
 1980 OK 137, 617 P.2d 1347, Mattoon v. City of Norman
Discussed
 1961 OK 283, 370 P.2d 300, SEITZ v. JONES
Discussed
 1905 OK 120, 83 P. 903, 16 Okla. 286, BLINCOE v. CHOCTAW OKLAHOMA & WESTERN R.R. CO.
Discussed